|  |  |
|---|---|
| TOSIN ADETORO, ET AL., | ) |
|  | ) |
| Plaintiff, | ) Case No. 19-cv-01918 |
|  | ) |
| v. | ) |
|  | ) |
| KING ABDULLAH ACADEMY, ET AL., | ) **ORAL ARGUMENT** |
|  | ) **REQUESTED** |
| Defendants. | ) |
|  | ) |

## DEFENDANT KING ABDULLAH ACADEMY'S MOTION TO DISMISS

Defendant King Abdullah Academy ("KAA") moves to dismiss the Second Amended Complaint filed on behalf of Plaintiffs Tosin Adetoro, Barbara Balduman, Natasha Gaujean-LaMar, Alexis Greer, Kethurah Howell, Sepideh Javaheri, Michael Schramm, and Diane Wilkins (collectively, the "Plaintiffs") in this matter on November 22, 2019 (the "SAC"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). A Memorandum of Points and Authorities in support the Motion are filed herewith.

**ORAL HEARING REQUESTED**

Pursuant to Local Civil Rule 7(f), KAA respectfully requests that an oral hearing be held on its Motion to Dismiss.

Date: September 10, 2020          Respectfully submitted,

                              KALBIAN HAGERTY LLP

                              /s/ Haig V. Kalbian
                              Haig V. Kalbian (D.C. Bar # 400976)
                              Stephen Leckar (D.C. Bar # 281691)
                              Evan M. Lisull (D.C. Bar # 1023596)
                              888 17th Street, N.W., Suite 1000
                              The Brawner Building
                              Washington, D.C. 20006
                              hkalbian@kalbianhagerty.com
                              Phone: (202) 223-5600
                              Facsimile: (202) 223-6625
                              *Counsel for Defendant King Abdullah Academy*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of September 2020, I have electronically filed the foregoing with CM/ECF system, which will then send a notification of such filing (NEF) to the following:

                              Edward Lee Isler, Esq.
                              Lori H. Turner, Esq.
                              ISLER DARE, P.C.
                              1945 Old Gallows Road, Suite 650
                              Vienna, Virginia 22182
                              eisler@islerdare.com
                              lturner@islerdare.com
                              *Attorneys for Defendant*
                              *The Embassy of the Kingdom of Saudi Arabia*

                              Phyllis Rambsy
                              The Spiggle Law Firm, PC
                              4830 A 31st Street, South
                              Arlington, Virginia 22206
                              prrambsy@spigglelaw.com
                              *Counsel for Plaintiffs*

                                      /s/ Haig V. Kalbian
                                      Haig V. Kalbian

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOSIN ADETORO, ET AL., | ) |
| | ) |
| Plaintiff, | ) Case No. 19-cv-01918 |
| | ) |
| v. | ) |
| | ) |
| KING ABDULLAH ACADEMY, ET AL., | ) **ORAL ARGUMENT** |
| | ) **REQUESTED** |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT KING ABDULLAH ACADEMY'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................iii

INTRODUCTION ...............................................................................................1

STATEMENT OF FACTS ...................................................................................2

      a.    Plaintiffs and their employment history at KAA ...............................2

      b.    Plaintiffs' description of the KAA/Embassy Relationship ................4

      c.    Other purported allegations of discriminatory actions ....................4

      d.    Summary of new allegations .............................................................5

      e.    Summary of omitted or abandoned allegations .................................6

PROCEDURAL BACKGROUND .........................................................................7

STANDARD OF REVIEW ..................................................................................7

      a.    Rule 12(b)(1) .....................................................................................7

      b.    Rule 12(b)(6) .....................................................................................8

ARGUMENT ......................................................................................................9

I.     PLAINTIFFS CANNOT ALLEGE SUBJECT-MATTER JURISDICTION OVER THE DCHRA AND TITLE VII CLAIMS (COUNTS I AND III ............................9

     A.  PLAINTIFFS' TITLE VII CLAIMS (COUNT III) ARE UNTIMELY ..............9

            i.    All but one of the Plaintiff's Title VII claims were filed more than 300 days after they had notice of the adverse action taken against them .............................................................9

            ii.   Charges of discrimination "initially filed" with the EEOC must be filed within 180 days of the date of the alleged discrimination ...............................................................10

           iii.  There are no statutory (or regulatory) lifelines that save

Plaintiffs from an untimeliness argument .................................13

   B. NO SUBJECT-MATTER JURISDICTION CAN BE ASSERTED AGAINST
      EITHER DEFENDANT UNDER THE DCHRA .................................17

   C. ANY PERMISSIBLE DCHRA CLAIM IS UNTIMELY .................................21

II.    THE FAC FAILS TO ADEQUATELY STATE CLAIMS AGAINST KAA
      UNDER FED. R. CIV. P. 12(b)(6) .................................22

   A. PLAINTIFFS FAIL TO ALLEGE TITLE VII/DCHRA CLAIMS .................................23

        i.      Plaintiffs fail to allege a single plausible comparator .................................23

        ii.     Plaintiffs also fail to account for the same-actor inference
                and other plausible alternative explanations .................................27

        iii.    The FAC's allegations pertaining to the Plaintiffs' conditions
                Of employment at KAA also fail to provide a basis for or nexus
                To their discrimination claims .................................31

   B. PLAINTIFFS' § 1981 CLAIMS ALSO FAIL TO STATE A CLAIM .................................34

        i.      Any claims of race discrimination are inconsistent with
                Plaintiffs' prior persistent written and oral representations
                That their Section 1981 claims targeted Saudis .................................34

        ii.     The Supreme Court's recent *Comcast* decision preclude
                mixed-motive § 1981 cases such as Plaintiffs' .................................38

III.   THE FAC SHOULD BE DISMISSED WITH PREJUDICE .................................39

CONCLUSION .................................40

# TABLE OF AUTHORITIES

**CASES**                                                                               **PAGE**

*Abebio v. G4S Gov't Sols., Inc.*,
72 F. Supp. 3d 254 (D.D.C. 2014) ............................................................. 23

*Adeyemi v. District of Columbia*,
525 F.3d 1222 (D.C. Cir. 2008) ................................................................. 32

*Al Fayed v. CIA,*
229 F.3d 272 (D.C. Cir. 2000) ................................................................... 18

*Amiri v. Hilton Washington Hotel*,
360 F. Supp. 2d 38 (D.D.C. 2003) ............................................................. 34

*Apollo v. Bank of America, NA*,
315 F. Supp. 3d 436 (D.D.C. 2018) ........................................................... 38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................... 8, 9, 27, 29, 30, 31

*\*Ashraf-Hassan v. Embassy of France in U.S.*,
878 F. Supp. 2d 164 (D.D.C. 2012) ................................................ 11, 12, 13

*Ass'n of Flight Attendants v. U.S. Dept of Transp.*,
564 F.3d 462 (D.C. Cir. 2009) ................................................................... 23

*Barbour v. Browner*,
181 F.3d 1342 (D.C.Cir.1999) ................................................................... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................... 8, 27, 29, 31

*Bennett v. Solis*,
729 F.Supp.2d 54 (D.D.C.2010) ................................................................ 33

*Berger v. Medina Cty. Ohio Bd. of Cty. Comm'rs*,
295 Fed. Appx. 42 (6th Cir. 2008) ............................................................. 12

*Blackman v. Visiting Nurses Ass'n*,
694 A.2d 865 (D.C. 1997) ......................................................................... 31

*Bomberger v. Benchmark Builders, Inc.*,
No. CV 16-1071-RGA, 2017 WL 1377595 (D. Del. Apr. 13, 2017) ................ 14

*Bowers v. D.C.*,
883 F. Supp.2d 1 (D.D.C. 2011) ..................................................................................... 11

*Breard v. Greene*,
523 U.S. 371 (1998) ........................................................................................................ 18

*Carrillo v. Illinois Bell Tel. Co.*,
538 F. Supp. 793 (N.D. Ill. 1982) ................................................................................... 36

*Carter v. George Washington Univ.*,
387 F.3d 872 (D.C. Cir. 2004) ............................................................................. 12, 13, 14

*Carter v. George Washington Univ.*,
180 F. Supp.2d 97 (D.D.C. 2001) ............................................................................. 12, 13

*Chambers v. D.C.*,
389 F. Supp. 3d 77 (D.D.C. 2019) ................................................................................... 14

*Cole v. Boeing Co.*,
845 F. Supp. 2d 277 (D.D.C. 2012) ................................................................................. 19

*Coleman v. Maryland Court of Appeals*,
626 F. 3d 187 (4th Cir. 2010) .......................................................................................... 27

*Comcast Corp. v. Nat'l Assoc. of African-American Owned Media*, ___ U.S. ___,
140 S. Ct. 1009 (2020) ................................................................................. 2, 22, 34, 38

*Cooper v. Henderson*,
174 F. Supp. 3d 193 (D.D.C. 2016) ................................................................................. 11

*Corley v. United States*,
556 U.S. 303 (2009) ........................................................................................................ 16

*Crawford v. Barr*,
No. 17-798, 2019 WL 6525652 (D.D.C., Dec. 4, 2019) .......................................... 24, 31

*Delaware State Coll. v. Ricks*,
449 U.S. 250 (1980) ........................................................................................................ 10

*Dieng v. American Institutes for Research in the Behavioral Sciences*,
412 F. Supp.3d 1 (D.D.C. 2019) ...................................................................................... 11

*Doe v. Fed. Democratic Rep. of Ethiopia*,
189 F. Supp. 3d 6 (D.D.C. 2016) ..................................................................................... 18

*Doe v. Lee*,
Case No. 19-cv-0085, 2020 WL 759177 (D.D.C. Feb. 14, 2020) ........................................ 9, 20

*\*Easaw v. Newport,*
253 F. Supp. 3d 22 (D.D.C. 2017) ........................................ 23, 29, 31, 32

*\*Eaves v. City of Charlotte,*
No. 3:16CV129-GCM, 2016 WL 5109165 (W.D.N.C. Sept. 19, 2016) ........................ 30

*Emerson Elec. Co. v. Schlesinger,*
609 F.2d 898 (8th Cir. 1979) ........................................ 13, 14

*Fairbanks v. Rolle*r,
314 F. Supp. 3d 85 (D.D.C. 2018) ........................................ 8

*Golden v. Management and Training Corp.*,
266 F.Supp.3d 277 (D.D.C. 2017) ........................................ 20

*Grand Lodge of Fraternal Order of Police v. Ashcroft,*
185 F. Supp. 2d 9 (D.D.C. 2001) ........................................ 7

*Harris v. Wackenhut Servs., Inc.,*
648 F. Supp. 2d 53 (D.D.C. 2009) ........................................ 31

*Hollins v. FNMA,*
760 A.2d 563 (D.C. 2000) ........................................ 33

*Hyman v. First Union Corp.*,
980 F. Supp. 46 (D.D.C. 1997) ........................................ 34

*In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*,
683 F.3d 462 (3d Cir. 2012) ........................................ 21

*In re Grand Jury Investigation*,
916 F.3d 1047 (D.C. Cir. 2019) ........................................ 12

*Iwebo v. Sheppard Ptatt Health System, Inc.*,
No. 19-3008, 2020 WL 4748579 (D. Md. Aug. 14, 2020) ........................................ 39

*James Madison Ltd. by Hecht v. Ludwig,*
82 F.3d 1085 (D.C. Cir. 1996) ........................................ 40

*Johnson v. Perez,*
66 F. Supp. 3d 30 (D.D.C. 2014) ........................................ 32

*Jordan v. Evans*,
404 F. Supp. 2d 28 (D.D.C. 2005) ........................................................................ 18

*Jung v. George Washington University*,
875 A.2d 95 (D.C. 2005) ....................................................................................... 33

*Khalik v. United Airlines*,
671 F.3d 1188 (10th Cir. 2012) ............................................................................ 40

*Kidane v. Northwest Airlines, Inc.*,
41 F. Supp. 2d 12 (D.D.C.1999) ........................................................................... 34

*Laurent v. Bureau of Rehabilitation, Inc.*,
544 F. Supp. 2d 17 (D.D.C. 2008) ....................................................................... 25

*\*Mack v. Aspen of DC, Inc.*,
248 F. Supp. 3d 215 (D.D.C. 2017) ..................................................................... 20

*Major v. Plumbers Local Union No. 5 of the United Assoc. of Journeymen and Apprentices of the Plumbing and Pipe-Fitting Indus. of the U.S. and Can., AFL-COI*,
370 F. Supp. 2d 118 (D.D.C. 2005) ..................................................................... 11

*Marcus v. Geithner*,
813 F. Supp. 2d 11 (D.D.C. 2011) ....................................................................... 18

*Martin v. Locke*,
659 F. Supp. 2d 140 (D.D.C. 2009) ..................................................................... 25

*McCarthy v. Kemper Life Ins. Companies*,
924 F.2d 683 (7th Cir. 1991) ................................................................................ 32

*McCaskill v. Gallaudet Univ.*,
36 F. Supp. 3d 145 (D.D.C. 2014) ....................................................................... 23

*\*McCleary-Evans [v. Maryland Dep't of Transp.*,
No. CIV. CCB-13-990, 2013 WL 5937735 (D. Md. Nov. 5, 2013) ..................... 30

*McFarland v. George Washington University*,
935 A.2d 337 (D.C. 2007) ................................................................................... 24

*McNair v. District of Columbia*,
213 F. Supp. 3d 81 (D.D.C. 2016) ....................................................................... 32

*Meeks & Schill*,
43 F.3d 1507 (D.C. Cir. 1995) ............................................................................. 25

vi

*Mesumbe v. Howard University,*
706 F. Supp. 2d 86 (D.D.C. 2010)............................................................................23

*Middlebrooks v. Godwin Corp.,*
722 F. Supp. 2d 82 (D.D.C. 2010)............................................................................38

*Miles v. Howard Univ.,*
83 F. Supp. 3d 105 (D.D.C. 2015)............................................................................21

*Miles v. UDC,*
Case No. 12-378, 2013 WL 5817657 (D.D.C. Oct. 30, 2013)................................19

*Moini v. LeBlanc,* ___ F. Supp.3d ___,
2020 WL 1975786 (D.D.C. Apr. 24, 2020)...........................................8, 10, 11, 37, 39

*Monteilh v. AFSCME, AFL-CIO,*
982 A.2d 301 (D.C. 2009)........................................................................................19

*\*Ndondji v. InterPark Inc.,*
768 F. Supp. 2d 263 (D.D.C. 2011).....................................................................34, 37

*Neuren v. Adduci, Mastriani, Meeks & Schill,*
43 F.3d 1507 (D.C. Cir. 1995).................................................................................24

*Nyunt v. Chairman, Broad. Bd. of Governors,*
589 F.3d 445 (D.C. Cir. 2009).................................................................................34

*Nyunt v. Tomlinson,*
543 F. Supp. 2d 25 (D.D.C. 2008)...........................................................................34

*Phillips v. Holladay Corp.,*
No. 96-cv-7202, 1997 WL 411695 (D.C. Cir. June 19, 1997)................................24

*Phillips v. Holladay Prop. Servs., Inc.,*
937 F.Supp. 32 (D.D.C. 1996).................................................................................24

*Quraishi v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.,*
2013 WL 2370449 (D. Md. May 30, 2013).............................................................37

*Rios v. Marshall,*
530 F. Supp. 351 (S.D.N.Y.1981)............................................................................18

*Rochon v. Ashcroft,*
319 F. Supp. 2d 23 (D.D.C. 2004)............................................................................23

*Simens v. Reno*,
960 F. Supp. 6 (D.D.C. 1997)..............................................................................23

*Simpkins v. Washington Metro. Area Transit Auth.*,
No. 96-7188, 1997 WL 702349 (D.C. Cir. Oct. 10, 1997)..............................13

*Simms v. U.S. Gov't Printing Office*,
87 F. Supp. 2d 7 (D.D.C. 2000)..........................................................................33

*Slate v. Pub. Def. Serv. for the D.C.*,
31 F. Supp. 3d 277 (D.D.C. 2014)......................................................................23

*St. Francis College v. Al-Khazraji*,
481 U.S. 604 (1987).............................................................................................35

*Straughn v. Delta Air Lines, Inc.*,
250 F.3d 23 (1st Cir.2001).................................................................................32

**Sturdza v. United Arab Emirates*,
281 F.3d 1287 (D.C. Cir. 2002)..........................................................................18

*Talavera v. Fore*,
648 F. Supp. 2d 118 (D.D.C. 2009)....................................................................33

*Texas v. Equal Employment Opportunity Comm'n*,
933 F.3d 433 (5th Cir. 2019)...............................................................................13

*Texas Department of Community Affairs v. Burdine*,
450 U.S. 248 (1981).............................................................................................23

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006)...............................................................................8

*Vatel v. Alliance of Auto. Mfrs.*,
627 F.3d 1245 (D.C.Cir.2011).............................................................................28

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
409 F.3d 359 (D.C. Cir. 2005)...............................................................................8

*Vt. Agency of Nat'l Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000).............................................................................................18

*Walker v. Jones*,
733 F.2d 923 (D.C. Cir. 1984)...............................................................................7

*Waterhouse v. District of Columbia*,
298 F.3d 989 (D.C.Cir.2002) ................................................................28

*\*Zoubair v. United Arab Emirates*,
Case No. 99-2263 ........................................................................18

*Zoubair v. United Arab Emirates*,
48 F. App'x 336, 337 (D.C. Cir. 2002) ........................................18

## **RULES**

Fed. R. Civ. P. 12(b)(1) ................................................................1, 7, 8

Fed. R. Civ. P. 12(b)(6) ..............................1, 8, 19, 22, 27, 31, 36

Fed. R. Civ. P. 15 ........................................................................40

## **STATUTES**

D.C. Code § 2-1401.01 ................................................................7

D.C. Code § 2-1401.02(10) ........................................................18

D.C. Code § 2-1401.02(21) ........................................................18

42 U.S.C. §1981 ................................1, 2, 7, 18, 22, 34, 37, 38

42 U.S.C. 2000e ........................................................................7

42 U.S.C. 2000e-5 ....................................................................15

42 U.S.C. 2000e-5(e)(1) ............................................................10

42 U.S.C. 2000e-5(1) ................................................................16

42 U.S.C. 2000e-8 ....................................................................15

42 U.S.C. 2000e-8(b) ........................................................14, 15, 16

42 U.S.C. § 2000e-12(a) ............................................................13

29 C.F.R. § 1601.13(a)(2) ..........................................................13

29 C.F.R. § 1601.13(a)(4)(ii)(A) ................................................14

## OTHER AUTHORITIES

SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS,
("Reading Law") (2012).........................................................................14, 15

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) Defendant King Abdullah Academy ("KAA") moves to dismiss the Second Amended Complaint (the "SAC").

## **INTRODUCTION**

During oral argument held on KAA's Motion to Dismiss ("2019 MTD") Plaintiffs' First Amended Complaint ("FAC"), this Court gave Plaintiffs one last chance to amend the complaint: "we're not going to keep going through this."[1]

Despite being given a third chance to state their claims, Plaintiffs' SAC does not meaningfully resolve the three main arguments previously advanced by KAA: (1) the DCHRA claim fails because it is entirely predicated on acts of the D.C.-based Embassy of Saudi Arabia (the "Embassy"), which is a foreign sovereign and outside the statute's scope; (2) the Title VII claims were untimely filed; and (3) the 42 U.S.C. § 1981 claims fail to state claims of discrimination on the basis of race, rather than on national origin—the latter point now even more dispositive in light of an intervening Supreme Court decision.[2]

Instead, the SAC only underscores the appropriateness of dismissing Plaintiffs' claims entirely. Plaintiffs' new Title VII allegations reveal that almost all those claims are time-barred even under a 300-day filing period. When it comes to the DCHRA claims, the SAC's allegations once again fail to establish a joint-employer relationship between the Embassy and KAA necessary for such claims. The only acts connected to D.C. were performed by the Embassy, a foreign sovereign that is immune from DCHRA liability.

---

[1]     Transcript of Motion Hearing, October 16, 2019, attached as **Exhibit 1**, at 40:1-2.

[2]     KAA does not seek to belabor this Court with a complete replication of the arguments analyzed by the Court in the 2019 MTD; however, out of an abundance of caution, KAA incorporates by reference arguments raised in its 2019 MTD as may be applicable.

The only remaining cause of action is Plaintiffs' § 1981 claim. Throughout the oral argument, and throughout the SAC, Plaintiffs have emphasized that it is *Saudis* who ostensibly were favored at Plaintiffs' expense—a theory that arises out of national origin and not race, and thus a theory unavailable under 42 U.S.C. § 1981. What is more, whatever § 1981 theory Plaintiffs might have pursued has been sundered by *Comcast Corp. v. National Association of African American-Owned Media*, ___ U.S. ___, 140 S. Ct. 1009 (2020), which found unanimously that § 1981 claims alleging that race was a "motivating factor" were insufficient and thereby precluded "mixed motive" § 1981 claims. The SAC fails to establish a plausible basis under *Comcast* to conclude that *any* form of actionable discrimination was the but-for cause of their jobs being eliminated amidst the school's acknowledged mass downsizing of its workforce.

Plaintiffs have had nearly three years—and two amendments—to tell a sufficiently plausible story of discrimination. Each new version only further undercuts their claims. It is now time, more than ever, for the Court to dismiss Plaintiffs' claims with prejudice.

### STATEMENT OF FACTS[3]

a.    **Plaintiffs and their employment history at KAA.**

The eight Plaintiffs allege that they were hired by and employed by KAA, a "Saudi Arabian funded international school," in various administrative capacities. SAC ¶¶ 18-26. None allege that they taught at KAA at the time of their terminations.

Plaintiffs reflect a wide variety of races, religions, and national origins. SAC ¶¶ 18-25. Two—Barbara Balduman and Michael Schramm—claim to be Caucasian. SAC ¶¶ 19, 24. A

---

[3]    Sections (a), (b), and (c) of the Statement of Facts largely overlap with the 2019 MTD's Statement of Facts. Sections (d) and (e) summarize both the primary additions to and omissions from the SAC as compared to the FAC and the original Complaint.

third—Sepideh Javaheri—simply states that she is "Iranian," which is often deemed to mean Caucasian. SAC ¶ 23. Two—Javaheri and Tosin Adetoro—allege that they are Muslim. SAC ¶¶ 18, 23. While Ms. Javaheri alleges that she is Shia Muslim, Ms. Adetoro does not allege the branch of Islam to which she adheres. *Id.* Alexis Greer identifies with no religion. SAC ¶ 21. Mr. Schramm, who also alleges that religion must have played some role in his job being eliminated, merely states that his religion is "not Muslim." SAC ¶ 24. None identify any racist, ethnic or religious epithets ever made about them or in their presence by a co-worker, a manager or a decisionmaker.

Plaintiffs allege that KAA's launch "coincided with the closure of a nearby institution," the Islamic Saudi Academy ("ISA"). SAC ¶ 44. They claim that even before the start of the 2016-17 academic year, unidentified managers at "KAA began to give preference in hiring to [unnamed] Arabic Middle Eastern, Sunni Muslim candidates [with unstated qualifications seeking undefined positions]." SAC ¶ 45. Yet despite this conclusorily-stated preference, Ms. Adetoro, an African-American Muslim from Nigeria, was hired back in 2015. SAC ¶ 18. At the same time, Plaintiffs grudgingly admit that "the KAA staff did, initially, include some employees who were not Sunni Muslims of Arabic Middle Eastern descent"—tellingly including each of the Plaintiffs. SAC ¶ 66.

After being hired by KAA during (or before) the 2016-17 academic year, Plaintiffs assert that they were let go at the end of that academic year. *See* SAC ¶¶ 7, 18-25. Although Plaintiffs baldly allege that "KAA, directed by the Embassy," undertook these actions, they admit that this was "purportedly in response to financial issues which had arisen." SAC ¶¶ 70-71.

### b. Plaintiffs' description of the KAA/Embassy Relationship.

Plaintiffs claim that "[a]t all times relevant hereto, KAA and the Embassy were the Plaintiffs' joint employers." SAC ¶ 28. To support that legal conclusion, Plaintiffs allege that:

(1) "All financial activities for the KAA physical facility[] and employees were managed" in some unstated way by Suleiman Almoziel, an employee of the Embassy, and that KAA "had to obtain the approval of the Embassy in order to disburse funds for payroll." *See* SAC ¶¶ 31-36.

(2) The Executive Principal at KAA, who "would reasonably be expected to have authority and control over personnel decisions," attempted to terminate "an administrative assistant in the Admissions Department" but at some unstated time was "prevented" from doing so "at the directive [*sic*] of [an unidentified actor at] the Embassy." SAC ¶¶ 37-40. (Although the SAC is unclear, it appears that this administrative assistant is a woman named Adeelah Aljuhani. *Compare* SAC ¶¶ 37-40 (discussing "*an* administrative assistant in the Admissions Department") *with* SAC ¶¶ 46-48 (discussing Ms. Aljuhani, an "administrative assistant in the Admissions Department" whom "the Embassy prevented Mr. Faisandier from terminating") *and* FAC ¶¶ 37-40 (same).)

(3) "On [completely unparticularized] information and belief, [unnamed persons at] the Embassy directed [unidentified] KAA personnel to refrain from disciplining [unnamed] students who were Saudi Arabian and Muslim." SAC ¶ 42; *compare to* FAC ¶ 49 (same).

### c. Other purported allegations of discriminatory actions.

Plaintiffs additionally aver the following as discriminatory events pertaining to KAA staff (the majority of which involve student-teacher relations, not employment actions):

(1) During an (undated) conversation with Dr. Ibrahim Sakaji, "Ms. Adertoro [*sic*] asked about the possibility of" Dr. Shiree Slade, an African American woman who was Plaintiff Adetoro's direct supervisor, being promoted to principal of KAA." SAC ¶ 18. In response, "Dr. Sakaji stated that [unidentified] KAA representatives and the Embassy would not listen to a black woman." *Id.*

(2) Three students "of Saudi Arabian descent used racial slurs in referring to an [unnamed] African-American teacher,"[4] were not disciplined; instead, an unidentified person at the Embassy ordered Mr. Faisandier "to stop contacting the students about the issues of racial discrimination." SAC ¶¶ 48-51; *compare to* FAC ¶¶ 41-42 (previously alleging that one student used a racial slur against an African-American teacher).

---

[4]     None of the Plaintiffs allege they taught at KAA.

(3) Mr. Faisandier was also "not allowed [by some person of unidentified race and nationality to discipline [unnamed] students" who had directed unspecified slurs against "Ahmed Fetah," an HR assistant. SAC ¶¶ 52-53.

(4) Martha Aboudhamda, "who was of Arabic, Sunni Muslim [*sic*]," supposedly abandoned her unstated employment position for two months "without proper authorization" after being "granted a short bereavement leave following the death of her husband" and without informing her supervisor Plaintiff Schramm, but [undisclosed persons at] the Embassy "required KAA representatives to allow Ms. Abouhamda to return to her employment position." SAC ¶¶ 54-58. *Compare to* FAC ¶¶ 43-44. In alleged contrast, African-American female Faith Jefferies "was only allowed three (3) days of bereavement leave" from an unstated position. SAC ¶ 59.

(5) Unidentified "Saudi Arabian students" were treated by unidentified persons in a undefined superior manner to other unnamed students with respect to student-teacher and administrative relations. *See* SAC ¶¶ 60-64.

(6) In response to "financial issues which had risen," KAA terminated "a number of non-Saudi Arabian, non-Sunni Muslim employees." SAC ¶¶ 70-71; *compare to* SAC ¶ 72 (noting that the terminated were "*disproportionately* non-Sunni Muslims who were not of Arabic Middle Eastern descent) (emphasis added). No further allegations are made to quantify or otherwise contextualize the meaning of the term "disproportionate."

### d.       Summary of new allegations.

Although the redlined version of the SAC (Dkt. # 30-1) provides a helpful guide to the changes made from the FAC, for the Court's convenience, KAA summarizes the main changes as follows:

(1) The SAC now includes the dates that each Plaintiff received notice of their termination (all of which were between July 17 and July 31, 2017). SAC ¶¶ 7, 18-25.

(2) The SAC now includes limited allegations pertaining to alleged replacements for Plaintiffs Balduman and Wilkins. SAC ¶¶ 19, 25.

(3) The SAC now includes additional allegations pertaining to the Embassy's alleged involvement in financial and student discipline matters. SAC ¶¶ 31-43.

(4) The SAC also includes additional allegations pertaining to allegedly discriminatory conduct with respect to employees who are not plaintiffs in this action, with no allegation that those persons were terminated). *See* SAC ¶¶ 46-48 (Adeelah Aljuhani), ¶¶ 49-51 (Shaylin Holley), 52-53 ("Ahmed Fetah [*sic*, should be Fateh]"), 54-59 (Martha Abouhamda and Faith Jeffries).

(5) An allegation that former headmaster Chris Faisandier "and Plaintiff Diane Wilkins developed a list of KAA employees recommended for termination because of low performance scores." SAC ¶ 43. *Compare to* Dkt. # 22-5 at 2, 6, 9, 12, 15, 18, 21, and 24 (Plaintiffs' claims made to DCOHR that "*it was the Embassy*, not KAA, that created the list of people who would be terminated and the list of people who would remain" (emphasis in original)).

## e. Summary of omitted or abandoned allegations.

As telling as what little Plaintiffs added to the SAC is what they did not add and what they deleted from the FAC. Those omissions and deletions are summarized as follows:

(1) Plaintiffs have dropped the allegations that they were terminated without being given a reason. *See* Dkt. # 30-1 at 5-8, 10.

(2) Plaintiffs no longer allege that "KAA's operations were substantially controlled by the Embassy." Dkt. # 30-1 at 8.

(3) Plaintiffs no longer allege that "Non-Sunni Muslim employees who were not of Arabic Middle Eastern descent were subjected to disciplinary actions for attendance[-]related infractions." Dkt. # 30-1 at 12.

(4) Although Plaintiffs baldly allege that three [unnamed] *students* "of Saudi Arabian descent used racial slurs in referring to an [unnamed] African-American teacher," Plaintiffs never assert that any KAA teacher, executive or staff (or for that matter, any Embassy official) uttered any comments suggestive of racial, religious or national origin discrimination towards any student, or towards any of them.

(5) Plaintiffs no longer allege that "neutral criteria" were supposed to be used for termination decisions and that the KAA Board of Directors and the Embassy interfered with the use of this criteria. *See* Dkt. # 30-1 at 13; *compare to* SAC ¶ 43 (alleging that Faisandier and Plaintiff Wilkins "developed a list of KAA employees recommended for termination because of low performance scores").

(6) Plaintiffs do not make any allegations pertaining to the composition of KAA's Board of Directors, despite making such claims (improperly) in their opposition to KAA's original Motion to Dismiss. *Compare* Dkt. # 30-1 *with* Dkt. # 22 at 29 ("while not specifically plead in Plaintiffs' FAC, some of KAA Board Members also hold high level positions at the Embassy").

(7) Plaintiffs do not make any new allegations pertaining to the alleged transition from the former Islamic Saudi Academy ("ISA") to KAA, other than to contend that (a) an unnamed "employee on the Instructional Technology team" was a former ISA employee was not terminated; and (b) that Plaintiff Wilkins worked out of ISA until KAA's construction completed. This is contrary to factual assertions made in their Opposition to

the 2019 MTD. *Compare* SAC at ¶¶ 20, 25 *with* Dkt. # 22 at 9 ("The fact that ISA apparently shared employees with KAA during the transition in 2016 supports Plaintiffs' contentions that KAA is wholly controlled by the Embassy, which previously wholly controlled ISA").

(8) Plaintiffs make no allegations regarding "direct conversations from individuals at the embassy with the plaintiffs in this action," contrary to what was represented by their counsel to this Court in October 2019. *See* **Ex. 1** at 29:14-16.

## PROCEDURAL BACKGROUND

This action was removed from the Superior Court. On July 10, 2019, Plaintiffs filed their FAC, alleging three causes of action: Count I under the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et. seq.* ("DCHRA"); Count II under 42 U.S.C. §1981; and Count III under Title VII of the Civil Rights of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"). KAA timely moved to dismiss and on October 16, 2019, the Court heard oral argument on the 2019 MTD.

Based on Plaintiffs' representations made during oral argument, this Court granted them leave to file a second amended complaint. In doing so, the Court emphasized and warned that "[t]hird time [*i.e.*, a third version of the Complaint] is the charm because we're not going to keep going through this." **Ex. 1** at 40:1-2.

## STANDARD OF REVIEW

### a. Rule 12(b)(1).

The standard for evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(1) accepts as true a complaint's well-pleaded factual allegations. *See, e.g., Walker v. Jones*, 733 F.2d 923, 925-26 (D.C. Cir. 1984). For 12(b)(1) motions, however, Plaintiffs bear the burden of proving that this Court has subject-matter jurisdiction to hear their claims, and, thus, their factual allegations "will bear closer scrutiny" than a 12(b)(6) motion. *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (internal citations omitted). Additionally, a court evaluating a Rule 12(b)(1) motion "may consider materials outside of the

pleadings." *See, e.g., Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 366 (D.C. Cir. 2005).

### b.  Rule 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is *plausible* on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added); *accord Fairbanks v. Rolle*r, 314 F. Supp. 3d 85, 89 (D.D.C. 2018).

A claim is facially plausible when the factual allegations "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. *See also Fairbanks*, 314 F. Supp. 3d at 90. But a claim must demonstrate "more than a sheer possibility that the defendant has acted unlawfully," and must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

By the same token, the Court should not accept as true "a legal conclusion couched as a factual allegation" or an inference unsupported by facts alleged in the Complaint. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotations omitted); *Moini v. LeBlanc*, ___ F. Supp.3d ___, 2020 WL 1975786 at *3 (D.D.C. Apr. 24, 2020). Further, where the defendant's allegedly unlawful conduct has "an obvious alternative explanation," the complaint must allege facts that "plausibly suggest"—and are "not merely consistent with"—the defendant's liability. *Twombly*, 550 U.S. at 557, 567; *see also Iqbal*, 556 U.S. at 680 (explaining

that the complaint in *Twombly* failed because the defendants' alleged conduct "was not only compatible with, but indeed was more likely explained by, lawful ... free-market behavior").

"Ultimately, '[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Doe v. Lee*, Case No. 19-cv-0085, 2020 WL 759177 at *3 (D.D.C. Feb. 14, 2020) (quoting *Iqbal*, 556 U.S. at 679). The SAC, as KAA will now explain, asks the Court to depart from common sense.

## ARGUMENT
## I. PLAINTIFFS CANNOT ALLEGE SUBJECT-MATTER JURISDICTION OVER THE DCHRA AND TITLE VII CLAIMS (COUNTS I AND III)

### A. PLAINTIFFS' TITLE VII CLAIMS (COUNT III) ARE UNTIMELY.

#### i. All but one of the Plaintiff's Title VII claims were filed more than 300 days after they had notice of the adverse action taken against them.

Much of the discussion at oral argument focused on whether a 180-day or 300-day filing period applied to Plaintiffs' claim. The Court expressed concern that the FAC did not squarely allege the specific dates when each Plaintiff claimed to be terminated. **Ex. 1** at 39:8-13.

The SAC reveals why Plaintiffs were so loath to include this basic information: even the SAC concedes that *all but one of the Title VII plaintiffs filed their EEOC charge more than 300 days after the alleged adverse action*, as outlined below.[5] Thus, five of six Plaintiffs' Title VII claims are time-barred even under their own theory.

---

[5]     The SAC, like the FAC, does not assert Title VII claims on behalf of Plaintiffs Greer or Schramm. They received right-to-sue letters in June 2018 that required filing of a lawsuit within 90 days of their receipt. *See* Dkt #17 at 13 n.7; Dkt. # 17-6. They failed to do so.

| Plaintiff | Date of Adverse Action | Date of EEOC Filing[6] | Total Time Elapsed |
|-----------|------------------------|------------------------|--------------------|
| Adetoro | July 27, 2017 | May 24, 2018 | 302 days |
| Balduman | July 17, 2017 | May 14, 2018 | 301 days |
| Gaujean-La Mar | July 17, 2017 | May 30, 2018 | 318 days |
| Howell | July 27, 2017 | May 14, 2018 | 292 days |
| Javaheri | July 31, 2017 | May 30, 2018 | 304 days |
| Wilkins | July 26, 2017 | May 30, 2018 | 309 days |

Plaintiffs may argue that Balduman's claims are timely because, while she was informed of her termination on July 17, 2017, that termination did not take effect until July 31, 2017. *See* SAC ¶ 19. Such a contention, however, would fly in the face of *Delaware State Coll. v. Ricks*, 449 U.S. 250 (1980), which held that the limitations period commenced upon notice to the Plaintiff that an adverse employment decision had been rendered. This Court recently applied *Ricks* and granted a motion to dismiss a plaintiff's Title VII and DCHRA claims as "'conclusively time-barred.'" *Moini*, ___ F. Supp.3d at ___, 2020 WL 1975786 at *4-*9 (citation omitted).

The only Title VII claimant who has even a plausible basis for subject-matter jurisdiction is Kethurah Howell. However, as discussed below, her claims (to the extent that they might be at all plausible, which they are not) are untimely as well.

### ii. Charges of discrimination "initially filed" with the EEOC must be filed within 180 days of the date of the alleged discrimination.

As argued in the 2019 MTD, 42 U.S.C. § 2000e–5(e)(1) (entitled "Time for Filing Charges") is unambiguous: "A charge under this section shall be filed within one hundred eighty days after the alleged unlawful practice occurred[.]" The only exception to this 180-day filing

---

[6] All EEOC Charges of Discrimination were previously provided in connection with the 2019 MTD. *See* Dkt. # 17-5. KAA further notes that, in several circumstances, the date of filing with the Washington Field Office does not match the date that the Charge of Discrimination was signed. For example, Plaintiff Gaujean La-Mar's signature is dated May 24, 2018, but the filing stamp demonstrates that the Charge of Discrimination was not filed until May 30, 2018 at 3:22 pm. Dkt. # 17-5 at 3.

requirement occurs "in a case of unlawful employment practice with respect to which the person aggrieved has *initially instituted proceedings with a State or local agency* … such charge shall be filed … within three hundred days after the alleged unlawful employment practice occurred, or within thirty days of receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier." The fatal flaw that undercuts Plaintiffs' Title VII claims is that they first filed with the EEOC – not a State or local agency.

Plaintiffs indisputably initially instituted their proceedings with the federal EEOC, *not* the allegedly relevant local agency (the D.C. Office of Human Rights ("DCOHR").[7] Indeed, the Plaintiffs filed nothing before the DCOHR until the last week of July 2018, months after their filings before the EEOC. *See* Dkt. # 17-5. Since all Plaintiffs initially instituted proceedings with the EEOC and failed to file within the statutory 180-day deadline, their claims should be dismissed. *See, e,g., Ashraf-Hassan v. Embassy of France in U.S.,* 878 F. Supp. 2d 164, 170-71 (D.D.C. 2012); *see also Moini*, ___ F. Supp.3d ___, 2020 WL 1975786, at *8 (noting that in circumstances where plaintiff's EEOC charge "at most" was automatically cross-filed, "judges in this District have concluded that … the 180-day limitations period applies"); *Dieng v. American Institutes for Research in the Behavioral Sciences*, 412 F. Supp.3d 1, 12 (D.D.C. 2019) (applying 180-day deadline where plaintiff did not allege initially filing with the DCOHR); *Cooper v. Henderson*, 174 F. Supp. 3d 193, 202-03 (D.D.C. 2016) (same); *Bowers v. D.C.*, 883 F. Supp.2d 1, 6-7 (D.D.C. 2011) (same); *Major v. Plumbers Local Union No. 5 of the United Assoc. of Journeymen and Apprentices of the Plumbing and Pipe-Fitting Indus. of the U.S. and Can., AFL-COI,* 370 F. Supp. 2d 118, 126 (D.D.C. 2005) ("for the 300-day limit to apply, a plaintiff in a deferral state must first initiate a proceeding with the State or local agency having authority to

---

[7]     Plaintiffs do not allege that they ever filed any proceedings before the Fairfax County Office of Human Rights and Equity Programs ("OHREP"), the local agency that governs KAA.

grant the desired relief"); *Berger v. Medina Cty. Ohio Bd. of Cty. Comm'rs*, 295 Fed. Appx. 42, 46 (6th Cir. 2008) (300-day limitations period did not apply where aggrieved party did not first file with appropriate Tennessee agency).

These different filing deadlines also make sense as a matter of policy. The extension of the 180-day filing deadline is provided "to prevent forfeiture of a complainant's federal rights while participating in state proceedings." *Ashraf-Hassan,* 878 F. Supp. 2d at170-71 (internal citations omitted). That reasonable justification has no application here—as noted above, Plaintiffs did not begin participating in state-level proceedings until many months *after* filing claims before the EEOC.

During oral argument, this Court pondered whether *Carter v. George Washington Univ.*, 387 F.3d 872, 879 (D.C. Cir. 2004), might preclude finding that a 180-day filing deadline should govern these proceedings. *See* **Ex. 1** at 6:7-9:18.[8] However, *Carter*'s discussion of filing deadlines was mere dictum, as a determination of the filing deadline period was "not necessary for the holding" in that case. *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019) (internal citations omitted).

*Carter* was an appeal brought by an employee against whom the district court had issued summary judgment on the merits, without addressing the timeliness of Carter's claim. *See Carter v. George Washington Univ.*, 180 F. Supp.2d 97, 102-11 (D.D.C. 2001). The only reason that the *Carter* panel delved into the issue of timeliness was because it was raised as an aside in the university's brief. *See* Brief of Appellee, *Carter v. George Washington Univ.*, Case No. 01-7203, Mar. 29, 2004, at 18-19, excerpts of which are attached as **Exhibit 2**. As the university admitted, "this issue was raised before the District Court but not ruled upon." *Id.* at 18 n.8. The university

---

[8]     Plaintiffs did not even mention *Carter* in opposing the 2019 MTD. *See* Dkt. # 22.

never filed a cross-appeal seeking review of the district court's refusal to consider the question of timeliness.

An issue that was never decided by the district court could not, by definition, have been "necessary" for the *Carter* appeals panel's decision. The passing mention in *Carter*, compared to the more extensive discussion offered in *Ashraf-Hassan* (as well as by the Court of Appeals in *Simpkins v. Washington Metro. Area Transit Auth.*, No. 96-7188, 1997 WL 702349 (D.C. Cir. Oct. 10, 1997), only underscores this issue's mention as being dictum in *Carter*.[9] Accordingly, this Court is not bound by *Carter*, especially when contrasted to the more detailed reasoning offered by other persuasive authorities.

### iii. There are no statutory (or regulatory) lifelines that save Plaintiffs from an untimeliness argument.

Despite Congress' plain "initially instituted" statutory language, Plaintiffs—as well as courts that have permitted a 300-day deadline—base their germane[10] opposition on EEOC regulations permitting it to enter into work-sharing agreements with local agencies such as the DCOHR. *See* Dkt. # 22 at 22-23 (citing 29 C.F.R. § 1601.13(a)(2)). However, the "EEOC has limited rulemaking and enforcement power with respect to Title VII"—it "may not promulgate substantive rules." *Texas v. Equal Employment Opportunity Comm'n*, 933 F.3d 433, 439 (5th Cir. 2019) (internal citations omitted); *see also* 42 U.S.C. § 2000e-12(a) (permitting the EEOC "to time to issue, amend, or rescind suitable *procedural regulations*") (emphasis added).

In the context of EEOC regulatory authority, an impermissible substantive regulation is "one that affects individual rights and obligations." *Emerson Elec. Co. v. Schlesinger*, 609 F.2d

---

[9] *Ashraf-Hassan* recognized and cited the decision in *Carter*, but did not feel bound to accept its discussion of filing deadlines and timeliness. *See Ashraf-Hassan*, 878 F. Supp. 2d at 170. It is also noteworthy that *Carter* did not address the reasoning set forth in *Simpkins*.

[10] Most of Plaintiffs' Opposition relied on inapplicable case-law and regulatory provisions governing the ADA and ADEA. *See* Dkt. # 22 at 19-23; *see also* Dkt. # 24 at 9.

898, 902 (8th Cir. 1979). The provisions on which Plaintiffs have relied go directly to their obligations and rights under Title VII—specifically, how much time they have to submit administrative charges of discrimination in order to assert such claims later in court. *See Bomberger v. Benchmark Builders, Inc.,* No. CV 16-1071-RGA, 2017 WL 1377595, at *3 (D. Del. Apr. 13, 2017) (determining that an extension of filing deadlines for discrimination claims constitutes a substantive regulation). The EEOC's regulation and the work-sharing agreements promulgated under it are permissibly procedural when they deal with the internal processing—for example, the fact that a claimant need not make two separate filings, as entities operating under a work-sharing agreement will share filings with one another (though this does not resolve the still-unanswered question of why Plaintiffs filed separately with the DCOHR, given their purported reliance on the work-sharing agreement). But when the regulations attempt to unilaterally alter the "rights and obligations" imposed on claimants by Congress under Title VII, those regulations are unlawful. *Emerson Elec.*, 609 F.2d at 902.

This conclusion is further augmented by a close reading of the regulations under which the work-sharing agreement—in effect, a sub-regulation—arises. Courts in this District, when they have addressed this issue, correctly note that authority for the EEOC's entering into work-sharing agreements arises under the authority of 42 U.S.C. § 2000e-8(b).[11] That section of Title VII is entitled "Investigations." *See* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF

---

[11]     *See, e.g., Chambers v. D.C.,* 389 F. Supp. 3d 77, 86 (D.D.C. 2019) ("However, regardless of whether an aggrieved party initially instituted proceedings with a State or local agency, the 300-day filing period applies "where a worksharing agreement exists between the EEOC and a local fair employment practices agency." *Carter v. George Wash. Univ.*, 387 F.3d 872, 877, 879 (D.C. Cir. 2004) (citing 29 C.F.R. § 1601.13(a)(4)(ii)(A)); *cf.* 42 U.S.C. § 2000e–8(b) (authorizing the EEOC to "cooperate" and "enter into written agreements" with the State or local agency "charged with the administration of ... employment practices law").").

Legal Texts, ("Reading Law") (2012) ("The title and headings are permissible indicators of meaning.").

The fact that this "Investigations" section provides the sole basis for this work-sharing agreement highlights how inappropriate it is for such work-sharing agreements to alter substantive filing deadlines. The "Investigations" section reads, in its entirety, as follows (emphasis added):

> The Commission may cooperate with State and local agencies charged with the administration of State fair employment practices laws and, with the consent of such agencies, may, for the purpose of carrying out its functions and duties *under this subchapter* and within the limitation of funds appropriated specifically for such purpose, engage in and contribute to the cost of research and other projects of mutual interest undertaken by such agencies, and utilize the services of such agencies and their employees, and, notwithstanding any other provision of law, pay by advance or reimbursement such agencies and their employees for services rendered to assist the Commission in carrying out *this subchapter*. In furtherance of such cooperative efforts, the Commission may enter into written agreements with such State or local agencies and such agreements may include provisions under which the Commission shall refrain from processing a charge in any cases or class of cases specified in such agreements or under which the Commission shall relieve any person or class of persons in such State or locality from requirements imposed *under this section*.

The use of the terms "section" and "subsection" is telling and dispositive. "This subchapter" refers to Subchapter VI ("Equal Employment Opportunities") of Chapter 21 ("Civil Rights") of Title 42 ("The Public Health and Welfare") of the United States Code—in other words, Title VII of the Civil Rights Act of 1964 as a whole (including Section 2000e-5 ("Enforcement provisions"), the *section* that provides the basis for Plaintiffs' claims).

In stark contrast, "this section" refers *only* to 42 U.S.C. § 2000e-8—the section pertaining to investigations *by the EEOC*—a section that has no bearing whatsoever on Plaintiffs' claims.

Against this background, the scope of 42 U.S.C. 2000e-8(b) is far more limited than Plaintiffs apparently believe it is. With respect to subchapter-wide matters, the EEOC's cooperation with state and local agencies is limited to: (a) contributing towards research and

projects by state/local agencies; (b) utilizing the services of state/local agencies; and (c) reimbursing agencies for services rendered by state/local agencies. When it comes to work-sharing agreements, though, their scope is limited to "this section"—again, the section governing EEOC investigations. Work-sharing agreements can include provisions whereby the EEOC will "refrain from processing a charge" or where "any person" in the locality can be relieved "from requirements imposed *under this section*." 42 U.S.C. 2000e-8(b) (emphasis added).

There is nothing, however, in the language of 42 U.S.C. § 2000e-8(b) suggesting that the EEOC has the authority to unilaterally substantively strike and thereby amend the statutory language, thereby rendering 42 U.S.C. § 2000e-5(1) to read in effect that:

> A charge under this section shall be filed ~~within one hundred and eighty days~~ after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, ~~except that~~ in a case of an unlawful employment practice with respect to which the person aggrieved has ~~initially~~ instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred[.]

Congress has the power to make such changes; the EEOC, DCOHR, and Plaintiffs do not. Permitting Plaintiffs' reading of these provisions to prevail would render the "initially instituted" language of this statue meaningless, which this Court should be loath to do. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (internal citations and quotations omitted).

In sum, the statute requires that when claims are first filed with the EEOC that they must be filed within 180 days; Plaintiffs failed to do so, and no statutory (or regulatory) exception applies. Accordingly, all Title VII claims must be dismissed.

### B. NO SUBJECT-MATTER JURISDICTION CAN BE ASSERTED AGAINST EITHER DEFENDANT UNDER THE DCHRA.

Plaintiffs concede that KAA is a Virginia entity that does not reside in the District of Columbia. *See* SAC ¶ 6 ("Defendant Embassy resides within this judicial district and the other Defendant, KAA, is controlled[12] by the residing Defendant"); *see also* Dkt # 22-2 at 2 (King Abdullah Academy, Inc. is a Virginia corporation with its "principal office" located in Herndon, Virginia). Indeed, Plaintiffs further allege that Saudi Arabian students did not meet "the Virginia 'days in school' mandate of 180 days," an allegation that would not make sense if KAA were located in D.C. SAC ¶ 63. The SAC also alleges that Plaintiff Balduman ensured compliance with "county" and "state" regulations, not "District" regulations—again, meaningless allegations if KAA had any connection to D.C. SAC ¶ 19. To borrow from Plaintiffs' DCOHR dismissals, KAA "did not maintain a presence within the District of Columbia, is not substantially engaged in doing business within the District of Columbia; or is not operating an enterprise which is subject to licensing by the District of Columbia Government." Dkt. # 22-5 at 2.[13]

As a result, the SAC's *only* basis for advancing DCHRA claims against KAA arises out of DCHRA liability that might be incurred by the Embassy. Put another way, Plaintiffs' claim against KAA under the DCHRA is dependent upon Plaintiffs' establishing that the Embassy is liable under the DCHRA—if Plaintiffs cannot establish such a claim against the Embassy, their claim against KAA must also fail.

---

[12] *Compare to* FAC ¶ 29 (alleging that KAA was "substantially controlled" by the Embassy).

[13] At oral argument (and in their original opposition brief), Plaintiffs mischaracterized the content of the DCOHR's repeated dismissals of their claims. The DCOHR merely held that *if* the Embassy was subject to DCHRA claims, then Plaintiffs' claims would correspondingly satisfy the jurisdictional requirement that acts take place in D.C. *See* Dkt. # 22-6 at 3. DCOHR specifically reserved for this Court the question of whether the Embassy was subject to such claims at all. *Id.* at 4.

However, as explained in the 2019 MTD—and to-date unrebutted by Plaintiffs—the DCHRA does not provide for any liability against foreign sovereigns. The DCHRA applies to "employers," defined to be "any person … who employs an individual[.]" D.C. Code § 2-1401.02(10). The DCHRA's expansive definition of "person" (32 categories are named) does *not* include foreign sovereigns. *Id.* at 2-1401.02(21).[14] "The Supreme Court has "repeatedly held that the word 'person' in a statute does not include a sovereign government absent affirmative evidence of such an inclusory intent." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1307 (D.C. Cir. 2002) (citing *Al Fayed v. CIA,* 229 F.3d 272, 274 (D.C. Cir. 2000)); *see also Doe v. Fed. Democratic Rep. of Ethiopia*, 189 F. Supp. 3d 6, 12 (D.D.C. 2016) (quoting *Vt. Agency of Nat'l Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, (2000)). This Court and the Circuit Court of Appeals also specifically held in *Zoubair v. United Arab Emirates*, Case No. 99-2263, that a sovereign is not a person for purposes of the DCHRA. *See Zoubair v. United Arab Emirates*, 48 F. App'x 336, 337 (D.C. Cir. 2002); *see also* 2019 MTD at 8; Dkt. # 17-2; and Dkt. # 17-3. This is in accord with decisions holding that the federal government, as a sovereign, is not an employer subject to the DCHRA. *See, e.g., Marcus v. Geithner*, 813 F. Supp. 2d 11, 17 (D.D.C. 2011); *Jordan v. Evans*, 404 F. Supp. 2d 28, 31 (D.D.C. 2005). There is no legal basis for a different result here: nothing in the DCHRA suggests the presence of any intent by the D.C. government to extend the statutory scheme to encompass foreign sovereigns.[15]

---

[14]     *See* Dkt. # 17 at 7-8 (discussing the DCHRA).

[15]     Plaintiffs' § 1981 claim similarly fails to establish subject-matter jurisdiction against the Embassy. *See Sturdza*, 281 F.3d at 1307) (applying the Dictionary Act to civil rights statutes and holding that "a foreign government is not a person 'within' the meaning" of those statutes); *see also Breard v. Greene*, 523 U.S. 371, 378 (1998) (holding that foreign government is not a "person" as that term is used in § 1983); *Rios v. Marshall,* 530 F. Supp. 351, 372 n. 22 (S.D.N.Y.1981) (stating that foreign sovereigns are not "persons" for purposes of federal civil rights statutes).

Plaintiffs have made no further arguments or allegations that can subvert this finding. Because no claim can be asserted against the Embassy under the DCHRA, Plaintiffs' corresponding DCHRA claim against KAA must similarly fail.

Even if there were some basis for maintaining DCHRA jurisdiction over any of the Defendants, KAA's DCHRA liability, under Plaintiffs' submission, could stem only from having a status as a joint employer. However, Plaintiffs' claims still fall far short of the demanding requirements to allege such a relationship.[16]

Perhaps most crucially, Plaintiffs have failed to plead a crucial threshold requirement of advancing any DCHRA claim—that the employment decisions at issue were made in D.C. *Monteilh v. AFSCME, AFL-CIO*, 982 A.2d 301, 304–05 (D.C. 2009). In the absence of any such allegations, or allegations that Plaintiffs resided in D.C., and given that all Plaintiffs worked in Virginia for a Virginia corporation, their DCHRA claims lack a nexus to D.C. In the absence of any such allegations and where none of the Plaintiffs resided in D.C. and all worked in Virginia for a Virginia corporation, their DCHRA claims lack a sufficient nexus to D.C. *See Cole v. Boeing Co.,* 845 F. Supp. 2d 277, 285 (D.D.C. 2012) (dismissing DCHRA claims under Fed. R. Civ. P. 12(b)(6) where allegedly discriminatory acts occurred in Virginia and discriminatory effects were felt there).

Plaintiffs no longer allege that the Embassy "interfered" with the underlying termination process, which was their initial theory. *See* FAC ¶ 52. Now they assert that Chris Faisandier— KAA's executive principal (race, national origin, and religion unstated by the SAC)—and Plaintiff Diane Wilkins, as African-American personnel director, "developed a list of KAA employees recommended for termination because of low performance scores." SAC ¶ 43. Not

---

[16]     Both the DCHRA and Title VII "joint employer" claims are analyzed in the same way. *See, e.g., Miles v. UDC,* Case No. 12-378, 2013 WL 5817657, at *8 (D.D.C. Oct. 30, 2013).

only does this make the same allegation in different words—that employment matters were dealt with primarily by the KAA executives, and that an unnamed person or persons at the Embassy presumably interfered in that process in some unspecified way and to some undefined extent—but it also reaffirms that KAA employees (and indeed, one of the Plaintiffs) still created the original termination list.

Despite having had years to do so, Plaintiffs' SAC fails to rise to the level of joint-employer allegations required by well-reasoned decisions such as *Mack v. Aspen of DC, Inc.*, 248 F. Supp. 3d 215 (D.D.C. 2017). In *Mack*, allegations that the plaintiff (i) "reported to and was directly supervised" by a D.C. agency employee; (ii) was told that by a D.C. agency employee that she would receive an hourly rate increase; and (iii) the D.C. agency and the contractor had a contract that provided for the plaintiff's employment were deemed "thin" and failed to state a claim that the D.C. agency was a joint employer. *Id.* at 217, 219-20. Yet those legally insufficient allegations were ample compared to the SAC, which does not allege any direct communication between Plaintiffs and the Embassy pertaining to employment conditions. The SAC also fails to aver that any Embassy officials played any role in hiring any of the Plaintiffs, determining their compensation, supervising any of their work, training them, maintaining their employment records, establishing common employment policies or having anything whatsoever to do with their working conditions or their being let go. *Compare Doe v. Lee*, 2020 WL 759177 at *10 (recognizing that under Title VII and DCHRA test, to qualify as a joint employer the defendant must have "'retained for itself sufficient control of the terms and conditions' of plaintiff's employment") (dismissing complaint; citations omitted); *see also Golden v. Management and Training Corp.*, 266 F.Supp.3d 277, 287-288 & n.9 (D.D.C. 2017) (pointing to lack of allegation that alleged joint employer could "control and direct" both the details and results of plaintiff's

work or that it controlled the "terms and conditions" of his employment); *Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 117 (D.D.C. 2015) (Defendant's quality control oversight was "insufficient to establish that it was a joint employer of the plaintiff")), *aff'd*, 653 F. App'x 3 (D.C. Cir. 2016).

The only remaining non-conclusory allegations pertaining to the purported Embassy control of KAA's affairs pertain to (i) KAA's finances and (ii) KAA's involvement in some student affairs. With respect to finances, even if KAA was a wholly-owned subsidiary—which Plaintiffs do not even come close to alleging—that factually untethered claim would not provide a basis for a finding a joint-employer relationship. *See, e.g., In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 683 F.3d 462, 464 (3d Cir. 2012) (finding that the parent company was not the joint employer for employees of wholly owned subsidiaries). With respect to student affairs, Plaintiffs' allegations have no bearing on the control over the *employment* relationship between Plaintiffs and KAA.

As a result, Plaintiffs have once again failed to allege that KAA and the Embassy were so interrelated that they operated as one. Plaintiffs do not allege a joint-employer relationship sufficient to maintain a DCHRA claim against the Virginia-based KAA.

## C.     ANY PERMISSIBLE DCHRA CLAIM IS UNTIMELY

As set forth above, there is no basis for exercising DCHRA claims over either the Embassy or KAA. However, even if there were a basis for such claims, they are additional barred for being untimely—as set forth in greater detail in the memorandum in support of the motion to dismiss filed by the Embassy, which KAA adopts by reference, those claims were not filed within the one-year period required under the DCHRA.

## II. THE FAC ALSO FAILS TO ADEQUATELY STATE CLAIMS AGAINST KAA UNDER FED. R. CIV. P. 12(b)(6).

As we have demonstrated above, Plaintiffs have failed entirely to establish subject-matter jurisdiction over KAA with respect to Counts I and III, and those causes of action fail on that basis alone. However, even if these jurisdictional bars did not apply, the SAC still fails to state any claim upon which relief can be granted.

Plaintiffs once again fall short of alleging any plausible Title VII and DCHRA claims against KAA. Despite having had years to gather their collective, executive and ground-level knowledge, Plaintiffs have not alleged a single appropriate comparator. They also fail to account for the fact that (a) the same Defendants who were alleged to have discriminated against them in some way were the same defendants who hired them; and (b) that at least one of the Plaintiffs was involved in the underlying decision-making process that led to KAA shedding much of its workforce. In addition, Plaintiffs acknowledge an alternative reason for their termination as "purportedly in response to financial issues which had arisen." The remaining allegations against Defendants amount to little more than collected water-cooler gossip for the 2016-17 academic year at KAA, stray second-hand remarks that cannot support plausibly pled discrimination claims.

Plaintiffs' § 1981 charge also is flawed irreparably for these reasons, all the more so in light of this Court's analysis of the Supreme Court's recent *Comcast* decision, but for another reason as well: their claim that Defendants discriminated against Plaintiffs "on the basis of race" is belied by their statements, both at oral argument and in the SAC, that they believe that Defendants discriminated on the basis of *national origin*—specifically, Saudi origin. This concession is fatal to their § 1981 claims.

## A. PLAINTIFFS FAIL TO ALLEGE TITLE VII/DCHRA CLAIMS.

To state a viable discrimination claim, a plaintiff "must offer facts sufficient to allege that (1) [he] is a member of a protected class, (2) [he] suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination, that is, an inference that [his] employer took the action because of [his] membership in a protected class." *Abebio v. G4S Gov't Sols., Inc.*, 72 F. Supp. 3d 254, 257 (D.D.C. 2014) (internal citations omitted) (DCHRA). An inference of discrimination cannot be created by a plaintiff's merely alleging that he or she is a member of a protected group.[17] Without minimum threshold requirements for prima facie claims, defendants would suffer "wide-reaching consequences for [their] reputation[s] and resources." *Rochon v. Ashcroft*, 319 F. Supp. 2d 23, 30 (D.D.C. 2004) (quoting *Simens v. Reno*, 960 F. Supp. 6, 9 & n.4 (D.D.C. 1997)).

### i. Plaintiffs fail to allege a single plausible comparator.

The SAC appears to allege two different types of comparators: those with respect to termination, and those with respect to workplace conduct.

Under Title VII, "it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258

---

[17] *See, e.g., Easaw v. Newport,* 253 F. Supp. 3d 22, 28-29 (D.D.C. 2017) (granting motion); *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 152-53 (D.D.C. 2014) (dismissing DCHRA claim; plaintiff did "not allege any facts here that could allow a jury to conclude that [defendant] took prohibited actions because of her membership in any of her claimed protected groups.") (citing *Ass'n of Flight Attendants v. U.S. Dept of Transp.,* 564 F.3d 462, 465 (D.C. Cir. 2009)); *Slate v. Pub. Def. Serv. for the D.C.*, 31 F. Supp. 3d 277, 297-98 (D.D.C. 2014) ("The plaintiff has failed to plead sufficient facts to demonstrate that he was suspended or terminated because of his male gender for two reasons. First, there is nothing to support a causal inference that gender was [defendant's] motivating factor, other than the plaintiffs conclusory allegations"); *Mesumbe v. Howard University,* 706 F. Supp. 2d 86, 92 (D.D.C. 2010) ("plaintiff cannot merely invoke his race in the course of a claim's narrative and automatically be entitled to pursue relief. Rather, plaintiff must allege some facts that demonstrate that race was the reason for defendant's actions.") (quotation omitted).

(1981). In a termination case such as this, Plaintiffs must allege "that the employer either did not treat members of the protected class neutrally or retained persons not within the protected class *in the same position*." *McFarland v. George Washington University*, 935 A.2d 337, 352 (D.C. 2007) (emphasis added) (internal citations omitted) (rejecting DCHRA claims). The plaintiff must show that "all of the relevant aspects of their employment situation were nearly identical" to establish an inference of discrimination. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (internal quotation marks omitted); *see also Crawford v. Barr*, No. 17-798, 2019 WL 6525652, *3 (D.D.C., Dec. 4, 2019) (Title VII; granting motion to dismiss; "to show that he is similarly situated to [a] fellow employee, plaintiff must 'demonstrate that all of the relevant aspects of their employment situation are nearly identical'"); *Phillips v. Holladay Prop. Servs., Inc. ,* 937 F.Supp. 32, 37 (D.D.C. 1996) ("to be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"), *aff'd sub nom. Phillips v. Holladay Corp.,* No. 96-cv-7202, 1997 WL 411695 (D.C. Cir. June 19, 1997).

Plaintiff Kethura Howell is illustrative of this problem. She does not make *any* allegations about the retention of *any* employees relevant to her position as a Professional Learning Community director for the 7th and 8th grades, and later as assistant director of the middle school. *See* SAC ¶ 22. There is no allegation about the standards to which she was subject as compared to any plausibly comparable employee.

Plaintiffs' failure to meet this basic requirement alone is fatal to virtually all of their Title VII and DCHRA claims. Like Ms. Howell, Plaintiffs Adetoro, Javaheri, and Schramm do not make *any* allegations about the retention of *any* employees relevant to *their* jobs.

Plaintiffs Balduman and Gaujean-La Mar, meanwhile, allege merely that employees *within their department* were retained—not that employees at comparable positions were retained. *See* SAC ¶ 19 (alleging that an administrative assistant "maintained employment"); SAC ¶ 20 ("[a]nother [unnamed] employee [of unstated religion] on the Instructional Technology team … was not terminated").

Plaintiffs also fail in numerous other respects to set forth the most basic allegations that might plausibly suggest they were subject to invidious discrimination. Howell, once again, is illustrative—she fails to name *any* supervisor who oversaw her performance, let alone terminated her. The same is true for Gaujean-La Mar and Javaheri. Three others—Balduman, Schramm and Wilkins—allege that their supervisor was Chris Faisandier, whose race, religion, and national origin are unidentified. SAC ¶¶ 19, 24, 25. Plaintiff Adetoro, an African American woman, alleges that her supervisor was Dr. Shiree Slade—*also an African American* woman. SAC ¶ 18. Plaintiff Greer, meanwhile, alleges that Plaintiff *Balduman* was her supervisor. SAC ¶ 21. *See Barbour v. Browner,* 181 F.3d 1342, 1345-46 (D.C.Cir.1999) (finding that two EPA employees with different ranks were not similarly situated even though some of their responsibilities were overlapping); *Martin v. Locke*, 659 F. Supp. 2d 140, 157 (D.D.C. 2009) (noting that an employee was not similarly situated to her manager); *see also Laurent v. Bureau of Rehabilitation, Inc*., 544 F. Supp. 2d 17, 23 (D.D.C. 2008) (noting that the plaintiff was not similarly situated to other employees because they were not supervisors).

Not only do those Plaintiffs who do identify a supervisor allege a broad and diverse variety of supervisors—none stated to be Saudi, Arab, or Muslim—they also fail to suggest, much less squarely state, that any Plaintiffs were subject to the same standards as any potential comparators. Indeed, the SAC, while discussing the work that each Plaintiff performed, fails to describe any situation in which they were subject to higher standards than ostensible Saudi, Arab, and/or Muslim comparators. The only events that rise above the level of boilerplate pertain to student relations and to teaching staff—but none of these Plaintiffs were teachers. *See* SAC ¶¶ 42, 49-53, 60-64.

A closer examination of the two potential exceptions to this paucity of pleading show that even when Plaintiffs try to add "meat" to their barebones complaint, they still fall short of satisfying *Twombly/Iqbal*. For example, Plaintiffs refer to bereavement leave afforded Martha Abouhamda (a "staff member") and Faith Jeffries (a "Drama Teacher"), both of whom are non-parties. *See* SAC ¶¶ 54-59. This story, however, fails to compare apples to apples. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (requiring disparate treatment allegations to be "nearly identical to prevent courts from second guessing employers' reasonable decisions and confusing apples with oranges."). For one, the SAC concedes that Abouhamda and Jeffries were both given a brief bereavement leave as a matter of policy. *Compare* SAC ¶ 55 (Abouhamda was granted a "short bereavement leave" upon the death of her husband) *with* SAC ¶ 59 (Jeffries permitted a three-day bereavement leave period). At this point, the alleged comparator received exactly the same treatment that the victim of alleged discrimination (again, a non-party to this action). Afterwards, the two employees' conduct diverges such that any comparison for purposes of alleging discrimination is unavailing. Abouhamda took two months beyond her granted leave and was terminated by Plaintiff Schramm, purportedly only to be overruled by "the Embassy."

The SAC, however, does not allege that Jeffries took additional time, let alone contend that efforts to terminate her were taken, much less identify the responsible manager, or even claim the efforts were rebuffed by "the Embassy." *See* SAC ¶ 59. Nor does the SAC account for the alternative common-sense explanation that KAA would not want to terminate employees within months of their spouse's deaths. These allegations—all relating to third parties—fail to state a plausible comparator claim. *Coleman v. Maryland Court of Appeals*, 626 F. 3d 187, 191 (4th Cir. 2010) (affirming grant of Rule 12(b)(6) motion), *aff'd on other grds,* 132 S.Ct. 1327 (2012).

The SAC also refers to a woman named Adeelah Aljuhani, but fails to depict her as an appropriate comparator for Plaintiff Greer. Although both are described as "administrative assistants" to Plaintiff Balduman, only Greer is alleged to have reported directly to Balduman. *See* SAC ¶¶ 19, 21. Yet it was Chris Faisandier, not Balduman, whose attempt to "terminate" Aljuhani's employment the Embassy allegedly prevented. SAC ¶ 48. Additionally, the SAC does not squarely allege that Greer was guiltless of "inappropriate conduct," again failing to account for an alternative explanation apparent on the face of the SAC.

When these meaningless comparisons are stripped away, the SAC is left with the same bare-bone allegations that permeated their two prior complaints—all of which fail to plausibly assert Title VII/DCHRA claims.

### ii. Plaintiffs also fail to account for the same-actor inference and other plausible alternative explanations.

There is another fatal flaw in the SAC, carried over from the FAC: the fact that the same Defendants alleged to have wrongfully terminated the Plaintiffs were the ones that hired them in the first place. *See* SAC ¶ 66 (alleging that "the KAA staff did, initially, include some employees who were not Sunni Muslims of Arabic Middle Eastern descent"). After all, "'it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to

hire,' especially 'when the firing has occurred only a short time after the hiring.'" *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C.Cir.2011) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C.Cir.2002) (alteration in original)).

Yet this revelation, unsurprisingly, understates how lacking in prejudice KAA's hires were. Neither its Executive Principal (Faisandier), its Deputy Executive Principal/Chief Academic Officer (Schramm) its "STEM Coordinator" (Adetoro), its Admissions Director (Balduman), its Human Resources Manager (Wilkins), its Director of Learning Resources (Gaujean-La Mar), nor its Professional Learning Community Director and Community Partnership Coordinator (Howell) are alleged to be Saudi/Arab or Sunni Muslims. Even further, the SAC now notes that yet another executive leader—Shiree Slade, the Director of Teaching and Learning—was an African American female. SAC ¶ 18. These allegations, if anything, ironically suggest a basis for claims of discrimination *against* Saudi/Arab Sunni Muslims, rather than in their favor.

This is not all: when it comes to Plaintiffs' terminations, as earlier noted, the SAC now alleges that Faisandier and Plaintiff Wilkins "developed a list of KAA employees recommended for termination because of low performance scores." SAC ¶ 43. The termination decisions made at the end of the 2016-17 academic year "affected all KAA staff including teaching and administrative staff." SAC ¶ 77. Plaintiffs thus recognize that Faisandier and Wilkins' list was the baseline for making employment decisions.

But in a transparent effort to avoid the implications of that inconvenient fact, Plaintiffs postulate that unnamed "Saudi Arabian Muslims who were on the list" were not terminated, while other unidentified employees of similarly unspecified ethnicity, race and religious beliefs "were eventually terminated." SAC ¶¶ 68-69. Such palpable coyness ought not to be rewarded.

Moreover, the SAC makes no allegations whatsoever as to whether any of the Plaintiffs were "on the list." Indeed, it makes no further allegations about "the list" at all, an unforgivable failure given that Wilkins, one of its two authors, is a Plaintiff. If one or more Plaintiffs were on the list that she co-authored, this would naturally explain why they were terminated—low performance scores.

In sum, Plaintiffs' failure to account for this alternative explanation provides yet another demonstration of their inability to draft a complaint that is "plausible." *Twombly*, 550 U.S. at 557, 567; *see also Iqbal*, 556 U.S. at 557 (explaining that the complaint in *Twombly* failed because the defendants' alleged conduct "was not only compatible with, but indeed was more likely explained by, lawful ... free-market behavior").

Plaintiffs' vaguely stating that some anonymous Saudi employees in unspecified positions were not fired (SAC ¶ 68), while recognizing that KAA was impacted by "financial issues which had arisen (SAC ¶ 71), does not pass muster, either—if anything the "plaintiff[s] further undermine[] [their] case by alleging other facts that suggest race was not a factor in the termination decision." *Easaw*, 253 F.Supp.3d at 32 (dismissing DCHRA claim; claim that "'senior management was being pressured to bring in employees from outside of AARP," [was] an entirely race-neutral rationale."). As noted above, most of the Plaintiffs make no allegations about their replacements (if any) following the RIF. None of the Plaintiffs make *any* allegations about their wages or the wages of other employees, thus failing to account for the likelihood that those of KAA's employees who were retained after the 2017 RIF were paid less than their predecessors because of the financial constraints that Plaintiffs recognize impacted KAA.

This is not the only instance of the Plaintiffs failing to account for plausible alternative explanations for events underlying their terminations. As alleged in the FAC, the SAC also

recognizes that "terminations were purportedly in response to financial issues which had arisen." SAC ¶ 71. Although the SAC includes a new allegation about the Embassy's purported control over financial matters through the presence of an Embassy employee named Suleiman Almonziel. (SAC ¶¶ 31-33), Plaintiffs have unwittingly disclosed an even *more* compelling alternative plausible explanation of the financial difficulties that overwhelmed KAA and prompted the underlying layoffs. As KAA observed in rebutting Plaintiffs' self-styled "joint actor" theory, the SAC does not assert that Mr. Almonziel or any Embassy staff made decisions over employment matters or policies—just entirely undefined financial ones. Almonziel's presence "was not only compatible with, but indeed was more likely explained by, lawful ... free-market behavior"). *Iqbal*, 556 U.S. at 557. The Kingdom, as a rational economic actor, would have had every incentive to take prophylactic steps to staunch KAA's financial hemorrhaging, given the Plaintiffs' theory that KAA was a "Saudi Arabian funded school." SAC ¶ 26.

In sum, like the FAC, the SAC asserts the type of "must have been" approach that fails to state a plausible discrimination claim. *See*, *e.g.*, *Eaves v. City of Charlotte*, No. 3:16CV129-GCM, 2016 WL 5109165, *3 (W.D.N.C. Sept. 19, 2016) ("Plaintiff simply alleges that because he was qualified for each position he applied for, his nonselection must have been because of his race. This form of 'must have been' speculation is the precise kind of unsubstantiated speculation that ran afoul the complaint in *McCleary-Evans* [*v. Maryland Dep't of Transp*., No. CIV. CCB-13-990, 2013 WL 5937735, at *3 (D. Md. Nov. 5, 2013), *aff'd* 780 F.3d 582]").Taken as a whole, the Plaintiffs' alleged wrongs do not follow as a matter of course from the barren factual predicates that they allege. Accordingly, their complaint must be dismissed.

### iii. The FAC's allegations pertaining to the Plaintiffs' conditions of employment at KAA also fail to provide a basis for or nexus to their discrimination claims.

What is left of the SAC, once all the foregoing failings are stripped away? As the Court noted back in October 2019, "there is pretty scarce detail" and a "paucity of specifics" throughout the FAC—and that "more is required under *Iqbal*" than allegations that "some random person" was "insulted by a student." **Ex. 1** at 27:10-15, 38:8-15; *see also* 33:5-8 ("under *Iqbal* and *Twombly* you are, basically, talking about an inappropriate comment made by a student and, surely, that isn't enough to sue the embassy and the academy for discrimination").

The SAC remains similarly devoid of factual specifics to set forth a plausible claim of any form of invidious discrimination—race, religion, or national origin. The SAC, like the FAC, relies heavily on statements made by students to teachers—perhaps misunderstanding this Court's concerns, it now alleges that "at least three" students and two separate staff members (non-Plaintiffs) were involved. SAC ¶¶ 49-53. This hearsay has no bearing whatsoever on Plaintiffs' employment conditions or termination. *See Easaw,* 253 F. Supp. 3d at 31; *see also Crawford*, 2019 WL 65225652, at *3) (granting Rule 12(b)(6) motion; "In order to support a finding of discriminatory animus, however, there 'must be a clear nexus between the stray workplace remark and the adverse action.'"); *Harris v. Wackenhut Servs., Inc.,* 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd,* 419 F. App'x 1 (D.C. Cir. 2011) (DCHRA; noting that "statements by nondecision makers are insufficient to meet plaintiff's threshold burden, as are stray remarks in the workplace by those not involved in the decisionmaking process" because even "the discriminatory animus of an employee's supervisor, who is not involved in the [adverse employment] decision ... cannot, as a matter of law, be imputed to the ultimate decisionmaker") (quoting *Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 869 (D.C. 1997)). Put another way,

Plaintiffs failed to establish a plausible nexus between the stray incidents they allege involving students and the harm that they claim to have suffered from losing their jobs in a reduction-in-force. *Easaw,* 253 F. Supp. 3d at 31-32.[18]

The only employment-related statement that any Plaintiff alleges purportedly comes from Plaintiff Adetoro, who asserts that she asked Dr. Ibrahim Sakaji on some unstated date whether non-party Shiree Slade might be promoted to principal. SAC ¶ 18. Dr. Sakaji allegedly replied that "KAA representatives and the Embassy would not listen to a Black woman." *Id.* This statement is a quintessential example of the type of "stray remark," unrelated to the decision-making process at issue, that fails to support discrimination claims. *Easaw,* 253 F. Supp. 3d at 31-32.; *cf., McCarthy,* 924 F.2d at 686. Indeed it is also, once again, inconsistent with the Plaintiffs' other theories: if the Embassy controlled KAA to the point that it was a joint employer "at all times relevant" to the SAC, why would KAA and the Embassy permit five non-Saudis to be members of KAA's executive leadership team? *See supra* at 25-26.

---

[18]  *See also Adeyemi v. District of Columbia*, 525 F.3d 1222, 1229 (D.C. Cir. 2008) (discounting comments about disabled employee made by non-decisionmaker); *McNair v. District of Columbia,* 213 F. Supp. 3d 81, 87-88 (D.D.C. 2016) (letting stand a claim for race discrimination where Plaintiff pleaded "at least one racially-motivated adverse employment action" against her, but dismissing a gender discrimination claim because Plaintiff failed to allege any connection between her gender and the alleged different treatment that she received). *Cf., Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir.2001) (affirming summary judgment; stating that the "probativeness" of discriminatory stray remarks "is circumscribed if they were made in a situation temporally remote from the date of the employment decision or ... were not related to the employment decision in question" (internal quotation omitted) (ellipses in original); *McCarthy v. Kemper Life Ins. Companies,* 924 F.2d 683, 686 (7th Cir. 1991) (also affirming grant of summary judgment and pointing out that  absent a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced); *Johnson v. Perez,* 66 F. Supp. 3d 30, 42 (D.D.C. 2014) (in context of summary judgment motion, finding that "the purported disparate treatment evidence has no apparent connection to the proffered reasons for [the employee's] termination and is therefore insufficient to show that those reasons were pretextual" and holding "that Plaintiff failed to demonstrate a genuine issue of material fact regarding whether Defendant's proffered nondiscriminatory reasons for terminating [the employee] are pretext for . . . discrimination").

The context in which the allegedly discriminatory remarks were made bears on their probative value in establishing pretext. *Bennett v. Solis*, 729 F.Supp.2d 54, 68-69 (D.D.C.2010). The law recognizes that evidence of a generalized bias against the abilities of a protected class "is not enough; there must be a causal link between the statements and the conduct about which the complaint is made." *Jung v. George Washington University*, 875 A.2d 95, 112 (D.C. 2005) (citing *Hollins v. FNMA*, 760 A.2d 563, 575 (D.C. 2000)), *amended on other grounds,* 883 A.2d 104 (D.C. 2005). "[S]tray remarks, 'even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff.'" *Talavera v. Fore*, 648 F. Supp. 2d 118, 132 (D.D.C. 2009) (quoting *Simms v. U.S. Gov't Printing Office*, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000)).

Of importance here, Plaintiffs do not claim the remark to Ms. Slade was made by anyone at an executive level—Dr. Sakaji was not alleged to be a KAA Vice Principal until *after* the statement was made. Nor do they claim that he had any input into the entirely unrelated decision to terminate any of them. *See* SAC ¶ 18. And it is telling that no one claims the remark had anything to do with Ms. Adetoro. The SAC does not even explain why Plaintiff Adetoro would have asked this question at all (as Chris Faisandier was KAA's executive principal) or even state when it supposedly was made. It is also more than a fair inference that neither Mr. Adetoro nor Dr. Sakaji had any such discussion while KAA was considering layoffs. Common sense would lead one to conclude that during that period employees would have been talking about their job protection, not speculating over whether a colleague might gain a promotion.

As a whole, Plaintiffs' newly-proffered "specifics" have nothing to do with either their conditions of employment or their terminations. KAA hired these Plaintiffs (belying any purportedly discriminatory animus), employed most of them in high-level positions, informed

them that financial issues required a RIF, entrusted Plaintiff Wilkins and Faisandier to create a list of employees to terminate, and followed (to some extent) those recommendations. The SAC once again falls far short of a sufficiently plausible allegations of employment discrimination; as a result, Plaintiffs' discrimination claims must be dismissed.

## B. PLAINTIFFS' § 1981 CLAIMS ALSO FAIL TO STATE A CLAIM

The issues outlined above all apply with equal force to Plaintiffs' claims brought pursuant to 42 U.S.C. § 1981. Yet the § 1981 claims fail for two additional reasons: (1) they are inconsistent with the SAC's allegations and Plaintiffs' counsel's representations, both before the EEOC and at oral argument on the 2019 MTD; and (2) they fail to allege a plausible claim of but-for causation as required by the Supreme Court in *Comcast Corp. v. Nat'l Assoc. of African-American Owned Media*, ___ U.S. ___, 140 S. Ct. 1009 (2020).

### i. Any claims of race discrimination are inconsistent with Plaintiffs' prior persistent written and oral representations that their Section 1981 claims targeted Saudis.

As Plaintiffs are well aware (*see* Dkt. # 22 at 38), Section 1981 does not permit claims based on national origin. *See, e.g., Ndondji v. InterPark Inc.,* 768 F. Supp. 2d 263, 273 (D.D.C. 2011); *see also Amiri v. Hilton Washington Hotel*, 360 F. Supp. 2d 38, 42-43 (D.D.C. 2003) (dismissing claim where allegations were "solely based on the fact that [Plaintiff] is from Afghanistan"); *Kidane v. Northwest Airlines, Inc.,* 41 F. Supp. 2d 12, 16-17 (D.D.C.1999) (dismissing § 1981 claims alleging national origin discrimination); *Hyman v. First Union Corp.*, 980 F. Supp. 46, 62-63 (D.D.C. 1997) (same). Race and national origin are "ideologically distinct" categories. *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 35 (D.D.C. 2008), *aff'd sub nom. Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009) (internal citations omitted). To maintain a Section 1981 claim, a plaintiff instead must demonstrate "intentional

discrimination solely [] because of ancestry or ethnic characteristics." *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Against this background, it is worth considering how Plaintiffs have consistently asserted the overall theory of their claims.

Plaintiffs continue to allege that KAA, operating under "directives" from the Embassy, ensured "that the Saudi students, the Saudi employees, were to be treated differently than the non-Saudi employees and students." **Ex. 1** at 25:19-26:3. This theme of Saudi favoritism was repeated throughout argument made by Plaintiffs' counsel. *Id.* at 26:9-18 (Plaintiffs believed that "Saudi nationals were going to be treated differently than the non-Saudis"); 27:20-22 (multiple Plaintiffs "saw similar treatment or discrimination towards non-Saudis"); 28:3-4 ("various claims being made that non-Saudis were treated differently"); 31:15-18 (Plaintiffs' position that "the embassy was funneling directives through [*KAA*] to discriminate against non-Saudis"). Indeed, Plaintiffs' counsel went so far as to concede that "the overlying umbrella" of Plaintiffs' complaint "is national origin." **Ex. 1** at 34:4-5.

That theory of national origin discrimination is further advanced throughout the SAC as well. The bulk of the SAC's allegations pertain to staff-student relations; specifically, that "Saudi Arabian" students were favored. SAC ¶ 42 ("the Embassy directed KAA personnel to refrain from disciplining students who were Saudi Arabian and Muslim"); ¶ 49 (three students of "Saudi Arabian descent" used slurs against an African American teacher and did not suffer consequences as a result); ¶ 60 (KAA teachers "were counseled about the need to maintain strong relationships with Saudi Arabian Sunni Muslim students"); ¶¶ 62-64 ("Saudi Arabian students" were permitted extended leave from school and their report cards were altered).

The emphasis on Saudi origin also carries over into allegations about employment favoritism. For instance, Plaintiffs allege that certain unidentified "Saudi Arabian Muslims who

were on the list recommended for termination were retained as employees at KAA" and that "[e]mployees who were not Saudi Arabian Muslims … that appeared on the list were eventually terminated." SAC ¶¶ 68-69; *see also* SAC ¶ 70 ("KAA, directed by the Embassy, terminated a number of non-Saudi, non-Sunni Muslim employees"). Further, the few specific allegations in the SAC continue to portray undue favoritism towards Saudis—that Nadia Yousef, alleged (incorrectly) to be Saudi Arabian, was hired as HR manager to replace Plaintiff Wilkins (SAC ¶ 25), and that the Embassy purportedly prevented the termination of Adeelah Aljuhani, a "Saudi Arabian" administrative assistant working in the Admissions department (SAC ¶¶ 46-48).

Additionally, three of the Plaintiffs—Balduman, Javaheri, and Schramm—never indicated in their EEOC Charges of Discrimination that they were discriminated on the basis of race by checking that box, even though their co-Plaintiffs did. *See* Dkt. # 17-5 at 2, 5-6. At oral argument, Plaintiffs' counsel claimed that this did not prevent those plaintiffs from filing a claim under § 1981—an argument not raised in their opposition brief, and an argument made without supporting authority. **Ex. 1** at 35:16-40:18. While such failure may not *jurisdictionally* prevent the assertion of a § 1981 count, in the face of Plaintiffs' repeated Saudi emphasis it does prevent allegation of a plausible claim under Fed. R. Civ. P. 12(b)(6) that seeks to advance a § 1981 claim. *See, e.g., Carrillo v. Illinois Bell Tel. Co.,* 538 F. Supp. 793, 797 n.3 (N.D. Ill. 1982) (dismissing § 1981 claim and noting that while the failure to check the box for race "has no jurisdictional impact on a § 1981 claim, it is indicative of how [*Plaintiff*] herself perceived the nature of the discriminatory conduct of which she complains").

Whatever else might be said about Plaintiffs' claims, this notion of Saudi-oriented favoritism at least might make a theoretical modicum of sense. It is conceivable, if not plausible, that an embassy would have a motive to protect its own nationals over others. But such a claim is

fatal to Plaintiffs' allegations under § 1981. It is devoid of any of the necessary allegations as to "ancestry or ethnic characteristics," or that otherwise suggest racial as opposed to national origin discrimination. *Ndondji*, 768 F. Supp. 2d at 273 (dismissing § 1981 claim where "nearly all of Nndonji's claims allege that he was discriminated against based on his national origin"); *see also Quraishi v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.*, 2013 WL 2370449, at *1-*2 (D. Md. May 30, 2013) (dismissing §1981 claim alleging that African American managers mimicked a Pakistani plaintiff's accent, were hired without the necessary certification that she possessed, and were given support that the plaintiff was not, because the complaint "fails to refer to specific ethnic characteristics associated with her Pakistani origin that might suggest that applying the broad definition of race is appropriate in this case"). *Compare to Moini v. LeBlanc*, ___ F. Supp.3d ___, 2020 WL 1975786 at *11 (denying motion to dismiss § 1981 claims for Plaintiff self-described as "Middle Eastern" rather than "Iranian").

The only exception to these national origin-oriented claims are allegations pertaining to Martha Abouhamda, "who was of Arabic, Sunni Muslim [*sic*]" and ostensibly received treatment that, as shown above, was not the same as that afforded to those not in the purportedly favored class. *See supra* at 24-25. But even if Ms. Abouhamda had received favorable treatment, that alone would fall far short of alleging race discrimination under § 1981. After all, the victim of such treatment would have been Faith Jeffries, who is not a Plaintiff.

Despite this Court's affording Plaintiffs one last chance to provide new allegations that would support a Section 1981 claim, and despite being represented by counsel, Plaintiffs have failed to do so. *Compare to Moini*, 2020 WL 1975786 at *11-*12 (denying motion to dismiss § 1981 claims on, *inter alia*, the basis that "*pro se* complaints are subject to even less stringent standards" of pleading than other complaints). None of the stray remarks they mention support

the "invidious discrimination" necessary for a Section 1981 claim, any more than for a Title VII theory. *See, e.g., Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 88 (D.D.C. 2010), *aff'd,* 424 Fed. Appx. 10 (D.C. Cir. 2011) (dismissing § 1981 claim where "only suggestion that plaintiff's race or color played any role in her interactions with [defendants] are [her] conclusory statements that she was 'terminated ... based on [her] race' and 'color'" and "none of the factual allegations in plaintiff's complaint suggest a racially discriminatory motive for defendants' treatment of plaintiff"); *see also Apollo v. Bank of America, NA*, 315 F. Supp. 3d 436, 438 (D.D.C. 2018) (dismissing § 1981 claim because the "mere failure to act in response to an alleged discriminatory act is not enough to give rise to plausible inference of discriminatory intent").

### iii. The Supreme Court's recent *Comcast* decision precludes mixed-motive § 1981 cases such as Plaintiffs'.

Even if the Plaintiffs had not precluded assertion of a § 1981 theory by their prior representations, they are now precluded from doing so because the SAC does not, and cannot, allege that any of the Plaintiffs were terminated but for their race, as required by *Comcast Corp. v. Nat'l Assoc. of African-American Owned Media*, 568 U.S. ___, 140 S. Ct. 1009 (2020).

In *Comcast*, the Supreme Court unanimously reversed a Ninth Circuit decision that held that § 1981 needed only to plead that race was a "motivating factor" in the complained-of action. *Comcast*, 140 S. Ct. at 1014. The Supreme Court held instead that the "because of race" language in § 1981 requires demonstration of but-for causation. *Id.* at 1014-15. In doing so, it emphasized the differences between § 1981 and Title VII claims, despite the nominal overlap in subject-matter. *Id.* at 1014-16.

This holding renders Plaintiffs' § 1981 claims futile. As discussed above, Plaintiffs cannot at this stage reasonably claim that, "but for" race, they would not have been terminated—

not that they ever set forth such a claim before. For one thing, the SAC emphasizes a rather remarkable mélange of "mixed motives" of race, religion, and/or national origin as allegedly motivating the eight Plaintiffs' termination decisions, with not a shred of direct evidence or a comparator. *See Iwebo v. Sheppard Ptatt Health System, Inc.*, No. 19-3008, 2020 WL 4748579, at *7 (D. Md. Aug. 14, 2020) (dismissing § 1981 termination claim under *Comcast*). That immediately separates the SAC from *Moini*, where the *pro se* plaintiff at least made a few specific factual allegations of disparate treatment and proffered a named comparator outside of the protected class who was promoted while the plaintiff was denied tenure. 2020 WL 1975786 at *12.

Additionally, the SAC fails to account for the obvious non-discriminatory explanation for their being laid off: the severe financial distress that they concede affected the school at the time their jobs were eliminated. Nothing appearing in the SAC provides grounds for a plausible alternative that race was the reason "but for" which they would not have been terminated. Accordingly, this claim should be dismissed as well.

## III. THE SAC SHOULD BE DISMISSED WITH PREJUDICE.

While the Court granted Plaintiffs leave to amend their FAC, it cautioned that "this is third time" and that it would not permit Plaintiffs to yet again have a *fourth* try at satisfactorily alleging a plausible cause of action. *See* **Ex. 1** at 39:24-40:2. They have failed to do so and the SAC should be dismissed with prejudice. This Court should, once and for all, dismiss the SAC with prejudice.

The futility concerns that KAA raised in its 2019 MTD apply with greater force to the SAC. Despite having been given another chance and over a month to compile all of the facts to support their claims of discrimination, the additions to the SAC are far from convincing. *See,*

*e.g., Khalik v. United Airlines*, 671 F.3d 1188 (10th Cir. 2012) (dismissing complaint where plaintiff failed to allege "certain details the plaintiff should know"). The eight Plaintiffs collectively allege a single direct statement that is even plausibly discriminatory – even that, like all of the other statements in the Complaint, was made by a non-decisionmaker. Any renewed request for leave to amend, in addition to flying in the face of the Court's clear directive, would also violate Fed. R. Civ. P. 15. *See, e.g., James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085, 1099 (D.C. Cir. 1996). Amendment with respect to Counts I (DCHRA) and III (Title VII) would be entirely futile, as those claims are barred either as untimely or for lack of jurisdiction; with respect to Count II, the Plaintiffs' own representations have ensured that this cause of action cannot be plausibly pled.

## CONCLUSION

This Court has already warned Plaintiffs that "***we're not going to keep going through this***." **Ex. 1** at 40:1-2 (emphasis added). Plaintiffs' SAC – their ***third*** "bite at the apple" – has only underscored the lack of merit to their claims. Whether for reasons of untimeliness, lack of jurisdiction, or lack of plausibility, the SAC should be dismissed, with prejudice, in its entirety.

Date: September 10, 2020

Respectfully submitted,

KALBIAN HAGERTY LLP


/s/ Haig V. Kalbian
Haig V. Kalbian (D.C. Bar # 400976)
Stephen Leckar (D.C. Bar # 281691)
Evan M. Lisull (D.C. Bar # 1023596)
888 17th Street, N.W., Suite 1000
The Brawner Building
Washington, D.C. 20006
hkalbian@kalbianhagerty.com
Phone: (202) 223-5600
Facsimile: (202) 223-6625
*Counsel for Defendant King Abdullah Academy*