# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TOSIN ADETORO, et al.

     Plaintiffs,

v.

Case No.:   1:19-cv-01918-TNM

KING ABDULLAH ACADEMY, et al.,

     Defendants.

## PLAINTIFFS' OPPOSITION TO DEFENDANT KING ABDULLAH ACADEMY'S MOTION TO DISMISS

COMES NOW PLAINTIFFS, Tosin Adetoro, Barbara Balduman, Natasha Gaujean-La Mar, Alexis Greer, Kethurah Howell, Sepideh Javaheri, Michael Schramm, and Diane Wilkins, ("Plaintiffs"), by and through undersigned counsel, and hereby submits this Opposition to Defendant King Abdullah Academy's ("KAA") Motion to Dismiss ("Motion") all claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and Federal Rule of Civil Procedure 12(b)(6) and to strike Plaintiffs' demand for a jury trial and punitive damages. A Memorandum of Points and Authorities in support of Plaintiffs' Opposition is filed herewith.

Pursuant to Local Civil Rule 7(f), Plaintiffs respectfully requests that an oral hearing be held on KAA's Motion.

DATED: September 24, 2020

Respectfully submitted,

THE SPIGGLE LAW FIRM PC

   /s/ Phillis h. Rambsy
Phillis h. Rambsy
Francisco Mundaca
4830 A. 31st Street, South
Arlington, Virginia 22206

202-499-8527 (telephone)
202-540-8018 (facsimile)
prambsy@spigglelaw.com
fmundaca@spigglelaw.com

*Counsel for Plaintiffs*

## Certificate of Service

I hereby certify that on September 24, 2020, Plaintiffs' Opposition to Defendant's Motion to Dismiss was filed electronically with the CM/ECF system, which will send a notification of the filing to the following:

Haig V. Kalbian (hkalbian@kalbianhagerty.com)
Stephen Leckar (sleckar@kalbianhagerty.com)
888 17th Street, NW, Suite 1000
The Brawner Building
Washington, DC 20006
*Counsel for Defendant King Abdullah Academy*

Edward Lee Isler (eisler@islerdare.com)
Lori H. Turner (lturner@islerdare.com)
Isler Dare, PC
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
(703) 748-2690 (telephone)
*Counsel for Defendant The Embassy*
 *of the Kingdom of Saudi Arabia*


        /s/ Phillis h. Rambsy
        Phillis h. Rambsy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TOSIN ADETORO, et al.

      Plaintiffs,

v.

KING ABDULLAH ACADEMY, et al.,

      Defendants.

Case No.:   1:19-cv-01918-TNM

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANT KING ABDULLAH ACADEMY'S MOTION TO DISMISS

Phillis h. Rambsy
Francisco Mundaca
4830 A. 31st Street, South
Arlington, Virginia 22206
202-499-8527 (telephone)
202-540-8018 (facsimile)
prambsy@spigglelaw.com
fmundaca@spigglelaw.com

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF PERTINENT FACTS ..........................................................1

       A.     Parties ............................................................................................................1

       B.     KAA/Embassy Joint Employer Relationship ...........................................7

       C.     Defendants' Discriminatory Actions .........................................................8

III.   STANDARD OF REVIEW..................................................................................11

       A.     FED. R. CIV. P. 12(b)(1) ........................................................................... 11

       B.     FED. R. CIV. P. 12(b)(6) ........................................................................... 12

IV.    ARGUMENT.........................................................................................................12

       A.     The Court Has Subject Matter Jurisdiction Over the DCHRA And Title VII

              Claims (Counts I and III)........................................................................... 12

              i.      Plaintiff's Title VII Claims (Count III) Are Timely...................................12

              ii.     Subject-Matter Jurisdiction Can Be Asserted Against Both Defendants

                      Under the DCHRA ...................................................................................16

              iii.    The DCHRA Claims Are Not Untimely.....................................................16

       B.     Plaintiffs Adequately Stated Claims Against KAA Under Fed. R. Civ. P. 12(b)(6)

              ......................................................................................................................... 17

              i.      Plaintiffs Have Stated a Claim For a Violation of Title VII and DCHRA 17

              ii.     Plaintiffs Have Stated a 1981 Claim.........................................................18

V.     CONCLUSION .....................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*Abebio v. G4S Gov't Sols., Inc.*, 72 F. Supp. 3d 254 (D.D.C. 2014).......................................18, 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...............................................................................12, 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).........................................................11, 12, 21

*Carter v. George Washington University*, 387 F. 3d 872 (D.C. Cir. 2004) ..................................13

*Conley v. Gibson*, 355 U.S. 41 (1957).......................................................................................11

*District of Columbia Retirement Bd. v. United States*, 657 F. Supp. 428 (D.D.C.1987) .............11

*Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843 (2019)...............................................................12, 13

*Golden v. Management and Training Corp.*, 266 F. Supp. 3d 277 (D.D.C. 2017).....................15

*Grand Lodge of Frat. Order of Police v. Ashcroft*, 185 F. Supp. 2d 9 (D. D.C. 2001)..........10, 11

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ...............................................................10, 11

*Herbert v. Nat'l Academy of Sciences*, 974 F. 2d 192 (D.C. Cir. 1992).......................................11

*Hohri v. United States*, 782 F.2d 227 (D.C. Cir.1986)...............................................................11

*Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12 (D.D.C.1999) .........................................20

*Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F. 3d 445 (D.C. Cir. 2009) ..........................20

*Nyunt v. Tomlinson*, 543 F. Supp. 2d 25 (D.D.C. 2008) ............................................................20

*Papasan v. Allain*, 478 U.S. 265 (1986)...................................................................................11

*Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F. 3d 247 (CA7 1994).............11

*Schuler v. PricewaterhouseCoopers, LLP*, 514 F. 3d 1365 (2008).......................................13, 14

*Scolaro v. D.C. Board of Elections and Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).............11

## STATUTES

29 C.F.R. § 1626.5.....................................................................................................................14

29 C.F.R. § 1626.10 .................................................................................................... 13, 14

29 C.F.R. § 1626.7 ........................................................................................................... 14

29 C.F.R. § 1626.8 ........................................................................................................... 14

42 U.S.C. § 1981 ............................................................................................... 1, 19, 20, 21

42 U.S.C. § 2000e ........................................................................................................ 1, 12

D.C. Code § 2-1401.01 et. seq. ............................................................................................ 1

LD.C. Code 2-1403.16(a) ................................................................................................... 18

**RULES**

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 1, 10, 11

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 1, 11

Fed. R. Civ. P. 8(a)(2) .................................................................................................... 11

## I.     INTRODUCTION

Plaintiffs' claims arise from KAA's and The Embassy of the Kingdom of Saudi Arabia's (the "Embassy") (collectively "Defendants") joint unlawful conduct as it pertains to the Plaintiffs' respective employment with Defendants. Specifically, Defendants violated the D.C. Human Rights Act, D.C. Code § 2-1401.01 et. seq. (the "DCHRA"); 42 U.S.C. § 1981 ("Section 1981); and Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), as described in Plaintiffs' Second Amended Complaint ("SAC") and more thoroughly described herein.  See SAC ¶ 4-6.

Following almost three (3) years of actions before the EEOC, the D.C. Office of Human Rights ("DCOHR") and the Superior Court for the District of Columbia, KAA and the Embassy now seek to dismiss the Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  The Defendants argument in support of dismissal generally allege lack of subject matter jurisdiction, failure of the Plaintiffs to file claims in a timely manner, and failure to the Plaintiffs to adequately state claims under the DCHRA, Title VII, and Section 1981.  Most of the Defendants' arguments are unvaried from the first motion to dismiss filed by KAA, which encompassed argument on behalf of the Embassy.  See SAC ¶8-16.

As indicated, Plaintiffs' claims are based on Defendants' unlawful employment actions. More specifically, the SAC alleges that Plaintiffs were terminated because of their race, religion, and/or national origin.   As Plaintiffs show herein, Defendant's Motion to Dismiss is unmeritorious, and should be denied.

## II.    STATEMENT OF PERTINENT FACTS

### A.     Parties

The Plaintiffs consist of a variety of races, religions, and national origins. As to religion,

of the eight (8) Plaintiffs involved in this matter, two are Muslim: one Shia Muslim; and one non-traditional Muslim who does not identify with any specific denominational sect.   In the SAC, the Plaintiffs accurately described the Plaintiffs as follows:

(1)     Plaintiff Tosin Adetoro, is an African American, Muslim woman born in Nigeria and raised in the United States. On July 11, 2016, Ms. Adetoro began employment at KAA as the Science, Technology, Engineering, and Math ("STEM") Coordinator.  Ms. Adetoro was in charge of the STEM and Science Department and the direct supervisor of eighteen (18) teachers.  Ms. Adetoro's role included assisting with recruitment, coaching, and retention of Science and STEM teachers, and providing STEM training for all teachers in the school. Ms. Adetoro's direct supervisor was Dr. Shiree Slade, an African American woman, and the Director of Teaching and Learning. While Ms. Adetoro is a Muslim, she does not wear traditional religious garments, such as a hijab, and her failure to do so was heavily scrutinized by KAA.   During a conversation with Dr. Ibrahim Sakaji, previously on the pastoral team at KAA, and was eventually promoted to Vice Principal at KAA, Ms. Adertoro asked about the possibility of Dr. Slade being promoted to principal. Dr. Sakaji stated that KAA representatives and the Embassy would not listen to a Black woman.  On July 27, 2017,  Ms. Adetoro was informed that she would not be offered a position at KAA for the 2017/2018 school year. Tosin Adetoro was terminated on July 27, 2017.  See SAC ¶ 7a, 18.

(2)     Plaintiff Barbara Balduman is a Caucasian, Catholic woman born and raised in the United States.  On or about June 6, 2016, Ms. Balduman began employment at KAA as the Admissions Director.   In her role as Admissions Director, she was responsible for developing and implementing policies and procedures, hiring

administrative staff, managing the registration process, and testing and enrolling students. Ms. Balduman oversaw the admissions process and the applications of over 1,200 applicants; she eventually enrolled over 800 students which involved overseeing the clinic staff, ensuring that county, state and federal regulations were complied with, and that student files were maintained privately and securely. Ms. Balduman reported directly to Chris Faisandier, the principal of KAA. On or about July 17, 2017, Ms. Balduman was notified that her last date of employment at KAA would be July 31, 2017. She was informed that the Admissions Office would be abolished and that both of her administrative assistants, Plaintiff Alexis Greer and Adeelah Aljuhani, would be terminated. However, although Plaintiff Alexis Greer and Ms. Balduman were terminated, Ms. Aljuhani maintained employment at KAA. Upon information and belief, Adeelah Aljuhani is a Saudi Arabian Muslim. Barbara Balduman was notified of her planned termination on July 17, 2017, and terminated on July 31, 2017. See SAC ¶ 7b, 19.

(3)    Plaintiff Natasha Gaujean-La Mar is a Haitian/African-American, Catholic woman, who was born and raised in the United States. In July 2016, Ms. Gaujean-La Mar began employment at KAA as the Director of Learning Resources. Prior to beginning employment at KAA, Ms. Gaujean-La Mar worked as an Instructional Technology Coordinator with various schools, and as an Education Technology Specialist with the New Jersey Department of Education. She also had a supervisor certification which helped her in her role as the Director of Learning Resources. As the Director of Learning Resources, Ms. Gaujean-La Mar was tasked with allocating funds and purchasing educational resources for staff and students while also managing the

instructional technology team.  On June 8, 2017, Ms. Gaujean-La Mar received an offer letter that included a contract for the 2017-2018 school year.  The offer letter indicated that Ms. Gaujean-La Mar would be the Senior Coordinator of Instructional Technology, instead of the Director of Learning Resources.  Ms. Gaujean-La Mar accepted the offer of employment, and signed and returned the contract on June 16, 2017.  Less than one month later, on July 17, 2017 after Salwa Linjawi had been named the new principal of KAA, Ms. Gaujean-La Mar received a letter indicating that "Regrettably, it is not the intention of King Abdullah Academy to offer you a position for the 2017/2018 Academic school year." Another employee on the Instructional Technology team, who was an American white male and former ISA employee was not terminated.  His title was Instructional Technology Coordinator.  Natasha Gaujean-La Mar was terminated on July 17, 2017.  See SAC ¶ 7c, 20.

(4)     Plaintiff Alexis Greer is an African-American woman, born and raised in the United States.  She does not identify with any specific religion.  On June 6, 2016, Ms. Greer began employment at KAA in an administrative role in the Admissions Office. Ms. Greer helped create the records system for student's grades and successfully assisted with student enrollment.  She also entered and managed students' schedules and grades. Additionally, Ms. Greer monitored the school's surveillance camera system.  Ms. Greer reported directly to Plaintiff Barbara Balduman. In July 2017, Ms. Greer was told that the Admissions Office was being abolished; and on July 31, 2017, Ms. Greer was terminated, although Adeelah Aljuhani, another administrative assistant in the Admissions Office, maintained employment with KAA.  Alexis Greer was terminated on July 31, 2017. See SAC ¶ 7d, 21.

(5)     Dr. Kethurah Williams Howell is an African-American, Christian woman who was born in the Bahamas and raised in Trinidad & Tobago.  On August 1, 2016, Dr. Howell began employment at KAA as the Professional Learning Community ("PLC") Director for 7th and 8th grade, and also as the Community Partnership Coordinator.    In December 2016, Dr. Howell became the Assistant Director of the Middle School (grades 5th-8th).  This role was similar to a Principal.   On May 25, 2017, Dr. Howell was offered a new contract for the 2017-2018 school year.  However, on July 27, 2017, Ms. Howell received a letter terminating her employment for the 2017-2018 school year.  Kethurah Howell was terminated on July 27, 2019.  See SAC ¶ 7e, 22.

(6)     Plaintiff Sepideh Javaheri is an Iranian, Shia Muslim woman, who was raised in Iran. In August 2016, Ms. Javaheri began employment at KAA as a medical technician.  However, her contract was not renewed for the 2017-2018 school year, and on July 31, 2017, Ms. Javaheri was terminated.   Sepidah Javaheri's last date of employment with KAA was July 31, 2017, as her contract was not renewed.  See SAC ¶ 7f, 23.

(7)     Plaintiff Michael Schramm is a Caucasian man who was born and raised in the United States.  Dr. Schramm is not Muslim.  On October 3, 2016, Dr. Schramm began employment at KAA as the Chief Academic Officer, but his title was eventually changed to Deputy Executive Principal.   His responsibilities included evaluating and advancing KAA's practices and systems of all aspects of teaching and learning, supervising and evaluating other KAA staff, and working in close partnership with the Executive Principal, Chris Faisandier.   During the third week of July 2017, Mr. Faisandier called Dr. Schramm by telephone to inform him that Dr. Schramm was being

terminated.  Michael Schramm was terminated in the third week of July 2017. See SAC ¶ 7g, 24.

(8)     Plaintiff Diane Wilkins is an African-American, Christian woman who was born and raised in the United States.  On March 1, 2016, she began employment at KAA as the Human Resources Manager; however, because KAA was still under construction, she worked out of the Islamic Saudi Academy ("ISA") in Alexandria, Virginia.  Ms. Wilkins reported directly to Chris Faisandier, the principal of KAA, until Salwa Linjawi was appointed as Acting Executive Principal on or about July 14, 2017. Ms. Wilkins' job responsibilities included providing strategic and operational day-to-day human resources leadership, ensuring compliance with federal and state laws and regulations relative to compensation, benefits, employment, payroll, and worker's compensation, and supervised staff in the HR department.  On July 26, 2017, Ms. Linjawi met with Ms. Wilkins and informed Ms. Wilkins that her contract was not going to be renewed.  Ms. Wilkins last date of employment was July 31, 2017.  Prior to her last date of employment, Ms. Wilkins was informed that both the Admissions Office and the Human Resources Office would be abolished.  However, on or about July 30, 2017, the position of HR Manager for KAA was posted.   On or about August 3, 2017, Dr. Mohammed Bin Abdullah Al-Eissa, the Saudi Cultural Attache to KAA, along with the Ambassador to the Saudi Embassy approved the hiring of Nadia Yousef for the position. On information and belief Ms. Yousef is Saudi Arabian and Muslim. Diane Wilkins was notified of her planned termination on July 26, 2017, and terminated on July 31, 2017. See SAC ¶ 7h, 25

## B.     KAA/Embassy Joint Employer Relationship

Plaintiffs were employed at KAA during the 2016-2017 Academic Year. Defendants terminated Plaintiffs' employment at the end of 2016-2017 Academic Year. Suleiman Almoziel, an employee of the Embassy, was in charge of overseeing the financial operations at KAA.  All financial activities, including banking, contracts, accounts payable/accounts receivable, employment terms, insurance payments for the KAA physical facility, and employees were managed by Mr. Almoziel.  KAA had to obtain the approval of the Embassy in order to disburse funds for payroll.  Correspondence dated August 16, 2016, from Chris Faisandier, the Executive Principal of KAA, to a Saudi official at the Embassy requested a transfer of $1,000,000.00 to cover payroll.  Correspondence dated March 15, 2017, from Zeyad Alazzaz, the Finance and Operations Manager for KAA, indicated that KAA was awaiting approvals on checks from certain Embassy officials. Certain departments, such as the Athletics Department, were promised computers and equipment.  However, when this equipment was not provided, the staff in the Athletic Department was informed that the Embassy did not approve the funds needed to purchase same.  Chris Faisandier was the Executive Principal at KAA during most of the 2016-2017 school year.  As Executive Principal, Mr. Faisandier would reasonably be expected to have authority and control over personnel decisions and operational functions at KAA.  However, the Embassy issued directives to Mr. Faisandier that he follow personnel decisions and operational functions at KAA.  Mr. Faisandier attempted to terminate an administrative assistant, in the Admissions Department; but at the directive of the Embassy, Mr. Faisandier was prevented from terminating the employee. Parents of students at KAA would make complaints to the Embassy, and the Embassy would direct KAA personnel as to how to resolve the complaint. The Embassy directed KAA personnel to refrain from disciplining students who were Saudi Arabian and Muslim.  Mr. Faisandier and Plaintiff Diane Wilkins developed a list of KAA employees

recommended for termination because of low performance scores.  See SAC ¶ 29-43.  Ignoring the recommendations by Mr. Faisandier and Plaintiff Wilkins, KAA retained Sunni Muslim employees who were of Arabic Middle Eastern descent.  See SAC § 76.

C.  **Defendants' Discriminatory Actions**

The opening of KAA coincided with the closure of a nearby institution, the Islamic Saudi Academy ("ISA").  Before the start of the 2016-2017 academic year, KAA began to give preference in hiring Saudi Arabian, Sunni Muslim candidates.  A Saudi Arabian, Sunni Muslim employee, Adeelah Aljuhani, an administrative assistant in the Admissions Department, was frequently insubordinate to her superiors.  On multiple occasions, Ms. Aljuhani advised the parents of KAA students to direct any complaints directly to the Embassy.  Ms. Aljuhani also engaged in other inappropriate conduct, including attempting to remove files from the KAA clinic, registering students without proper immunization records and/or expired visas, and refusing to adhere to policies/procedures.  Ms. Aljuhani was counseled about her inappropriate behavior, however, the Embassy prevented Mr. Faisandier from terminating her employment.  At least three (3) students of Saudi Arabian descent used racial slurs against an African-American teacher, Shaylin Holley.  Mr. Holley met with Plaintiff Dianne Wilkins and Mr. Faisandier on at least three (3) occasions to address the discriminatory treatment by students.  Mr. Faisandier requested a meeting with the students that demonstrated discriminatory behavior; but despite multiple requests, the students did not show up for the meeting.  Mr. Faisandier eventually received a directive from the Embassy ordering him to stop contacting the students about the isssues of racial discrimination.  An HR assistant, Ahmed Fetah, was also subject to racial discrimination, including being called derogatory names, by students.  Mr. Faisandier was not allowed to discipline the students directing racial slurs at Mr. Fetah.  Martha Abouhamda, a

KAA staff member, who was of Arabic, Sunni Muslim abandoned her job position for several months, without proper authorization, and without informing her supervisor Dr. Michael Schramm if she planned to return. Martha Abouhamda was granted a short bereavement following the death of her husband, but after two (2) weeks, several attempts were made by the HR Department to contact the employee to receive an update on her return to work date. The KAA HR Department did not receive a response from Ms. Abouhamda as to her return date. After two (2) months, Ms. Abouhamda finally contacted the HR Manager and was informed that she would be terminated. Ms. Abouhamda then contacted the Embassy, and the Embassy required KAA representatives to allow her to return to her employment position. Another KAA employee, Faith Jeffries, a Drama Teacher, and African-American woman, requested bereavement leave for the death of her husband; but Ms. Jeffries was only allowed three (3) days of leave. KAA teachers were counseled about the need to maintain strong relationships with Saudi Arabian Sunni Muslim students. Additionally, KAA employees were instructed not to discipline students with connections to the Embassy, and were directed to give those students preferential grading. Saudi Arabian students were allowed to travel on extended vacations, additional holidays, and leave from school; Saudi Arabian students were also allowed to begin school after the official start date, and complete school before the official end date. The excessive absences from school meant that some Saudi Arabian students did not take final examinations or meet the Virginia "days in school" mandate of 180 days. In spite of the missing examinations, excessive absences from school, and no meeting the "days in school" mandate of 180 days, the report cards of Saudi Arabian students were altered to allow students to advance to the next grade and/or graduate. Because of their race, ethnicity, and religion, Arabic Middle Eastern, Sunni Muslim candidates were hired instead of more qualified candidates who were not

Arabic Middle Eastern, Sunni Muslims. Despite given preferential treatment to Arabic Middle Eastern, Sunni Muslim candidates, the KAA staff did, initially, include some employees who were not Sunni Muslims of Arabic Middle Eastern descent. KAA gave Arabic Middle Eastern, Sunni Muslim candidates more favorable treatment than those employees who were not Sunni Muslims of Arabic Middle Eastern descent. Saudi Arabian Muslims who were on the list recommended for termination were retained as employees at KAA. Employees who were not Saudi Arabian Muslims, including African-American employees, and non-Saudi Arabian, non-Muslim employees, that appeared on the list were eventually terminated. See SAC 44-69.

After the conclusion of the 2016-2017 academic year, its first year in existence, KAA, directed by the Embassy, terminated a number of non-Saudi Arabian, non-Sunni Muslim employees. The terminations were purportedly in response to financial issues which had arisen. Nevertheless, in spite of purported financial issues, at KAA, employees who were Saudi Arabian and/or Sunni Muslim were not terminated. The employees selected for termination were disproportionately non-Sunni Muslims who were not of Arabic Middle Eastern descent. Employees selected for termination also included Muslims who did not wear religious garments and who were non-Sunni Muslims. Non-Muslim employees, who were not of Arabic Middle Eastern descent, and who had been initially recommended for retention, were also terminated from KAA. Sunni Muslim employees, who were of Arabic Middle Eastern descent, and who had initially been recommended for termination, were retained for employment at KAA. The termination decisions affected all KAA staff, including teaching and administrative staff. See SAC ¶ 70-77.

Plaintiffs' claims are not restricted solely to discriminatory conduct by Defendants on the basis of religion. Plaintiffs' claims also include allegations of discriminatory conduct by

Defendants as to race and national origin. As such, the Defendants were not required to be certain, or have personal knowledge, of any of the Plaintiffs specific religious beliefs to unlawfully discriminate against them. The Plaintiffs have contended since the initiation of this matter that the Embassy and KAA, specifically the Board of Directors for KAA, were the [joint] decision makers.

## III. STANDARD OF REVIEW

### A. FED. R. CIV. P. 12(b)(1)

"Rule 12(b)(1) deals with the court's subject-matter jurisdiction..." *Grand Lodge of Frat. Order of Police v. Ashcroft*, 185 F. Supp. 2d 9 (D. D.C. 2001)("Ashcroft"), quoting "*Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction. See *District of Columbia Retirement Bd. v. United States*, 657 F. Supp. 428, 431 (D.D.C.1987). Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority. *Ashcroft* at 14.

Furthermore, in deciding a 12(b)(1) motion, the court's consideration is not limited to the allegations of the complaint. See *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir.1986), vacated on other grounds, 482 U.S. 64, (1987). Rather, "[t]he court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." *Scolaro v. D.C. Board of Elections and Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Academy of Sciences*, 974 F. 2d 192, 197 (D.C. Cir. 1992)); see also *Haase v. Sessions*, 835 F. 2d 902, 906 (D.C.Cir.1987).

## B.    FED. R. CIV. P. 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The point of this requirement is to "give the defendant faire notice of what the…claims is and the grounds upon which it rests…" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)("Twombly"), quoting *Conley v. Gibson*, 355 U.S. 41, 47, (1957).   Although a complaint confronted by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, see *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F. 3d 247, 251 (CA7 1994), see *Papasan v. Allain*, 478 U.S. 265, 286, (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").   However, when a complaint pleads facts that make the claim plausible on its face, the court will not grant a dismissal.   See *Twombly* at 557.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief..." *Id*. at 679.

## IV.    ARGUMENT

### A.    The Court Has Subject Matter Jurisdiction Over the DCHRA And Title VII Claims (Counts I and III)

#### i.    Plaintiff's Title VII Claims (Count III) Are Timely

Contentions that Plaintiffs' Title VII claims are untimely are without merit.   In a situation such as this, when there exists a separate fair employment agency of the State or political

subdivision, claimants are directed to first file their claims with the local agency. It is only thereafter that they are to file with the EEOC. "For complaints concerning a practice occurring in a State or political subdivision that has a fair employment agency of its own empowered "to grant or seek relief," Title VII instructs the complainant to file her charge first with the state or local agency. § 2000e–5(c). The complainant then has 300 days following the challenged practice, or 30 days after receiving notice that state or local proceedings have ended, "whichever is earlier," to file a charge with the EEOC. § 2000e–5(e)(1)." *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843 (2019). In addition, if the state or local agency has a "worksharing" agreement with the EEOC, as is the case between the DCHOR and the EEOC, "a complainant ordinarily need not file separately with federal and state agencies. She may file her charge with one agency, and that agency will then relay the charge to the other. See 29 C.F.R § 1601.13 (2018)." *Id.*

The Defendants argument that the Plaintiffs only had 180 days to file with the EEOC is also without merit. "29 C.F.R. § 1601.13(a)(4)(ii)(A) provides that employees have up to 300 days to file where a worksharing agreement exists between the EEOC and a local fair employment practices agency. Since the EEOC had such an agreement with the D.C. Office of Human Rights at the time of Carter's complaint, …. Carter had up to 300 days to file with the Commission." *Carter v. George Washington University*, 387 F.3d 872 (D.C. Cir. 2004).

In this case the Plaintiffs did initially file their claims with the EEOC, and thereafter filed with the DCOHR. However, it is clear that in situations such as this, when both the EEOC and a local counterpart exists, that the law intends for said claims to first be filed with the local agency. As is discussed in further detail below, the Plaintiffs timely filed their complaints with the DCOHR. Furthermore, as has been previously established in this matter, a worksharing

agreement exists between the EEOC and the DCOHR. As such, the Plaintiffs complaints were timley filed with the DCOHR.

As Plaintiffs previously pointed out, *Schuler v. PricewaterhouseCoopers, LLP*, 514 F. 3d 1365 (2008)("Pricewaterhouse") provides guidance in precisely the issue of receipt of a complaint pursuant to a work sharing agreement. In determining which entity received Schuler's complaint, the EEOC's New York Field Office, the NYSDHR, the EEOC's District of Columbia Field Office, or the DCOHR, the Court weighed: "EEOC regulations, specifically 29 C.F.R. § 1626.10, allow the Commission to "enter into agreements with State or local fair employment practices agencies to cooperate in enforcement, technical assistance, research, or public informational activities, and [to] engage the services of such agencies in processing charges assuring the safeguard of the federal rights of aggrieved persons." *Id.* § 1626.10(a). The regulations further provide that these agreements may "authorize such agencies to receive charges and complaints pursuant to § 1626.5 and in accordance with the specifications contained in §§ 1626.7 and 1626.8." *Id.* § 1626.10(b). The first of these provisions allows aggrieved employees to submit EEOC charges "to any office of the Commission or to any designated representative of the Commission," *id.* § 1626.5, the second establishes timeliness requirements, *id.* § 1626.7, and the third prescribes the necessary substantive contents of charges, *id.* § 1626.8. Critically for this case, the regulation's final subsection provides:

> When a worksharing agreement with a State agency is in effect, the State agency will act on certain charges and the Commission will promptly process charges which the State agency does not pursue. Charges received by one agency under the agreement shall be deemed received by the other agency for purposes of § 1626.7.

*Id.* § 1626.10(c) (emphasis added). As had already been established in this case, the EEOC has entered into work-sharing agreements with the DCOHR. Thus, when the Plaintiffs

filed their charges with the DCOHR, it was "deemed received" by the EEOC, thus ensuring the timeliness of them with the EEOC.  See *Pricewaterhouse* at 1372.

In essence,, Plaintiffs timely filed their complaints with the DCOHR.  Therefore, pursuant to the legal authority applicable to the work-sharing agreement between the DCOHR and the EEOC, the Plaintiffs' EEOC claims were timely.

After being terminated, Plaintiffs timely filed charges with the DCOHR claiming discrimination on the basis of race, national origin, and religion. Plaintiffs' charges were dismissed from DCOHR, for lack of jurisdiction, via letters dated between September 10, 2018 and September 12, 2018.  In the letters dismissing the charges, DCOHR indicated that the Complainants could either file a request to reopen the charges at DCOHR or file a lawsuit on the merits of the case with D.C. Superior Court. On or about September 25, 2018, Complainants timely appealed the determination by DCOHR for lack of jurisdiction.  On December 18, 2018, DCOHR denied Complainants request to reopen the charges.  The DCOHR denial included notice that Plaintiffs could file a private action, on the merits, as DCOHR had administratively dismissed the matter.   Prior to initiating this Second Amended Complaint, Plaintiffs Tosin Adetoro, Barbara Balduman, Natasha Gaujean-La Mar, Kethurah Howell, Sepideh Javaheri and Diane Wilkins filed administrative claims with the Equal Employment Opportunity Commission ("EEOC") alleging violation of Title VII.  The administrative claims filed with the EEOC were timely. The administrative charges filed with the EEOC had been pending at the EEOC for more than 180 days.  A request for Right to Sue Letters was made on behalf of the Plaintiffs Tosin Adetoro, Barbara Balduman, Natasha Gaujean-La Mar, Kethurah Howell, Sepideh Javaheri and Diane Wilkins and issued by the EEOC on July 3, 2019.  Applying the controlling legal authority to the facts of this case, it is clear that the Plaintiffs claims were submitted in a timely manner.

### ii. Subject-Matter Jurisdiction Can Be Asserted Against Both Defendants Under the DCHRA

Despite the Defendants' claims to the contrary, the Plaintiffs SAC clearly demonstrates the level of joint-employer allegations needed to make such a claim. See *Golden v. Management and Training Corp.*, 266 F. Supp. 3d 277 (D.D.C. 2017)(pointing to lack of allegation that alleged joint employer could "control and direct" both the details and results of plaintiff's work or that it controlled the "terms and conditions" of his employment.") The SAC establishes that Plaintiffs were employed at KAA during the 2016-2017 Academic Year, and Defendants terminated Plaintiffs' employment at the end of 2016-2017 Academic Year.

As demonstrated by the extensive factual history delineated in the SAC, and outlined herein, it is clear that Embassy "retained for itself sufficient control of the terms and conditions' of plaintiff's employment" as to qualify as a joint employer with KAA. As such, subject matter jurisdiction over both Defendants is proper.

Indeed while decisions may have been communicated by KAA, it was mainly the Embassy that controlled and directed the details and results of Plaintiffs' (and other KAA employees) work. The Embasssy, also controlled the terms and conditions of employment for Plaintiffs and other KAA employees. Even more the Embassy also controlled the financial operations of KAA; and KAA basically had to gain approval from the Embassy in order to access money for basic operational tasks. Subject matter jurisdiction against both Defendants is, therefore, proper.

### iii. The DCHRA Claims Are Not Untimely

KAA asserts that the Plaintiffs' DCHRA claims are untimely as they were not filed within the one-year period required under the DCHRA. But this is false. The Plaintiffs timely filed charges with the DCOHR alleging discrimination based on race, national origin, and religion.

The DCHRA states that a "private cause of action" is to be filed "within one year of the unlawful discriminatory act, or the discovery thereof." LD.C. Code 2-1403.16(a). Furthermore, the "timely filing of a complaint with the Office [of Human Rights]… toll[s] the running of the statute of limitations while the complaint is pending". *Id.* As the facts stated above demonstrate, the Plaintiffs' DCHRA claims were timely filed pursuant to the applicable legal authority.

**B.    Plaintiffs Adequately Stated Claims Against KAA Under Fed. R. Civ. P. 12(b)(6)**

   **a.    Plaintiffs Have Stated a Claim For a Violation of Title VII and DCHRA**

A tenable discrimination claim requires that a plaintiff "[o]ffer facts sufficient to allege that (l) [he] is a member of a protected class, (2) [he] suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination, that is, an inference that [his] employer took the action because of [his] membership in a protected class." *Abebio v. G4S Gov't Sols., Inc.*, 72 F. Supp. 3d 254, 257 (D.D.C. 2014) (internal citations omitted) (DCHRA).

The core of the Plaintiffs' claims contends that the Defendants unlawfully terminated them on the basis of their religion, race, and/or national origin. KAA again correctly state that "An inference of discrimination cannot be created by plaintiff's merely alleging that he or she is, for example, a member of a protected group." However, the Plaintiffs pungently counterattack KAA's submission that the SAC should be dismissed because of any failure to adequately state a claim.

The SAC identifies the religion, race, and/or national origin of each Plaintiff. The SAC also stresses that the Defendants preferred employees of a certain religion, race, and/or national origin. The Plaintiffs allege facts, specifically the identification of the Plaintiffs terminated, that

would support a finding that Defendants did, in fact, effect unlawful and discriminatory treatment.

The eight (8) Plaintiffs in this matter were terminated absent an adequate reason and none of them are Arabic Middle Eastern, Sunni Muslims. These facts alone meet prongs 1 and 2 as provided by *Abebio v. G4S Gov't Sols., Inc.*, 72 F. Supp. 3d. 254, 257 (D.D.C. 2014). The Plaintiffs' assertions at SAC ¶¶ 18-119 satisfactorily meet the requirements of prong 3 under *Abedio*.

### ii.    Plaintiffs Have Stated a 1981 Claim

The purpose of Section 1981 claims is to provide a remedy or redress for instances of racially-motivated discrimination. Section 1981(a), which was originally enacted as the first section of the Civil Rights Act of 1866, 42 U.S.C. 1981, provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The law's intent is to put individuals on equal footing in the workplace, without regard to their race.

The Defendants assert that because the Plaintiffs also claim discrimination based on national origin, they are essentially prohibited from raising a separate claim of racial discrimination. There is no basis for this reasoning.

The Plaintiffs readily admit that section 1981 claims can only be brought because of racial discrimination, not discrimination based on national origin. See *Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12, 16-17 (D.D.C.1999) (dismissing § 1981 claims alleging national origin discrimination). However, as the Defendants point out, race and national origin

are "ideologically distinct" groupings. *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 35 (D.D.C. 2008), aff'd sub nom. *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F. 3d 445 (D.C. Cir. 2009) (internal citations omitted). As such, the Plaintiffs assert both discrimination based on national origin, and a separate claim for racial discrimination under 1981.

The SAC states clearly that the sole basis for the Plaintiffs' 1981 claims is racial discrimination at the hands of the Defendants. Furthermore, at the time of the oral argument on October 16, 2019, Plaintiffs' Counsel clarified that the basis for the 1981 claim was solely race:

> THE COURT: Okay. So your Count II – you have Count I, race, religion, and national origin discrimination; that's the DCHRA. Count II, 1981 is just race discrimination.
>
> MR. MUNDCA: Yes, Your Honor.
>
> THE COURT: Are you saying you intended for that to be broader than race discrimination?
>
> MR. MUNDACA: The 1981 claim, no, Your Honor.
>
> THE COURT: No. Okay. So for 1981 you are just relying on race?
>
> MR. MUNDACA: That's correct.

N.T. pg. 35, 5-15. Plaintiffs' counsel also clarified that the factual basis for the 1981 racial discrimination claim was in addition to, and separate and apart from, the Plaintiffs national origin based claims, "….They were also discriminated against for national origin, but they have separate race claims…." See N.T. pg. 36, 9-25. The SAC includes additional factual details as to the Plainitffs' 1981 claim. Accordingly, the Defendants' assertion that the 1981 claims fail is without merit.

## V. CONCLUSION

The SAC properly asserts jurisdiction over both KAA and the Embassy, and Plaintiffs' SAC meets the standards and requirements set forth in *Twombly* and *Iqbal*. In addition, the

Plaintiffs' claims are timely pursuant to DCHRA, Title VII, and Section 1981. For the reasons set forth herein, the Plaintiffs request that the Defendants' Motion to Dismiss be denied in its entirety.


DATED: September 24, 2020                          Respectfully submitted,

                                                   THE SPIGGLE LAW FIRM PC

                                                   _____/s/ Phillis h. Rambsy___
                                                   Phillis h. Rambsy
                                                   Francisco Mundaca
                                                   4830 A. 31st Street, South
                                                   Arlington, Virginia 22206
                                                   202-499-8527 (telephone)
                                                   202-540-8018 (facsimile)
                                                   prambsy@spigglelaw.com
                                                   fmundaca@spigglelaw.com

                                                   *Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that on September 24, 2020, Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss was filed electronically with the CM/ECF system, which will send a notification of the filing to the following:

Haig V. Kalbian (hkalbian@kalbianhagerty.com)
Stephen Leckar (sleckar@kalbianhagerty.com)
888 17th Street, NW, Suite 1000
The Brawner Building
Washington, DC 20006
*Counsel for Defendant King Abdullah Academy*

Edward Lee Isler (eisler@islerdare.com)
Lori H. Turner (lturner@islerdare.com)
Isler Dare, PC
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
(703) 748-2690 (telephone)
*Counsel for Defendant The Embassy*
*of the Kingdom of Saudi Arabia*

_____/s/ Phillis h. Rambsy_____
Phillis h. Rambsy