**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOSIN ADETORO, et al. | |
|     Plaintiffs, | |
| v. | Case No.:   1:19-cv-01918-TNM |
| KING ABDULLAH ACADEMY, et al., | |
|     Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA'S MOTION TO DISMISS AND TO STRIKE

COMES NOW PLAINTIFFS, Tosin Adetoro, Barbara Balduman, Natasha Gaujean-La Mar, Alexis Greer, Kethurah Howell, Sepideh Javaheri, Michael Schramm, and Diane Wilkins, ("Plaintiffs"), by and through undersigned counsel, and hereby submits this Opposition to Defendant the Embassy of the Kingdom of Saudi Arabia's ("the Embassy") Motion to Dismiss ("Motion") all claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and Federal Rule of Civil Procedure 12(b)(6) and to strike. A Memorandum of Points and Authorities in support of Plaintiffs' Opposition is filed herewith.

Pursuant to Local Civil Rule 7(f), Plaintiffs respectfully requests that an oral hearing be held on the Embassy's Motion.

DATED: September 24, 2020

Respectfully submitted,

THE SPIGGLE LAW FIRM PC

    /s/  Phillis h. Rambsy
Phillis h. Rambsy
Francisco Mundaca
4830 A. 31st Street, South
Arlington, Virginia 22206

202-499-8527 (telephone)
202-540-8018 (facsimile)
prambsy@spigglelaw.com
fmundaca@spigglelaw.com

*Counsel for Plaintiffs*

## Certificate of Service

I hereby certify that on September 24, 2020, Plaintiffs' Opposition to Defendant's Motion to Dismiss was filed electronically with the CM/ECF system, which will send a notification of the filing to the following:

Haig V. Kalbian (hkalbian@kalbianhagerty.com)
Stephen Leckar (sleckar@kalbianhagerty.com)
888 17th Street, NW, Suite 1000
The Brawner Building
Washington, DC 20006
*Counsel for Defendant King Abdullah Academy*

Edward Lee Isler (eisler@islerdare.com)
Lori H. Turner (lturner@islerdare.com)
Isler Dare, PC
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
(703) 748-2690 (telephone)
*Counsel for Defendant*
*The Embassy of the Kingdom of Saudi Arabia*


      /s/ Phillis h. Rambsy
Phillis h. Rambsy

TOSIN ADETORO, et al.

     Plaintiffs,

v.                        Case No.:   1:19-cv-01918-TNM

KING ABDULLAH ACADEMY, et al.,

     Defendants.

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANT THE EMBASSY OF THE KINGDOM OF SAUDI ARABIA'S MOTION TO DISMISS AND TO STRIKE

Phillis h. Rambsy
Francisco Mundaca
4830 A. 31st Street, South
Arlington, Virginia 22206
202-499-8527 (telephone)
202-540-8018 (facsimile)
prambsy@spigglelaw.com
fmundaca@spigglelaw.com
*Counsel for Plaintiff*

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF PERTINENT FACTS .......................................................... 1

     A.    Parties ................................................................................................. 1

     B.    KAA/Embassy Joint Employer Relationship ......................................... 7

     C.    Defendants' Discriminatory Actions ...................................................... 8

III.   STANDARD OF REVIEW ............................................................................. 11

     A.    FED. R. CIV. P. 12(b)(1) ...................................................................... 11

     B.    FED. R. CIV. P. 12(b)(6) ...................................................................... 12

III.   ARGUMENT ................................................................................................. 12

     A.    The Foreign Sovereign Immunities Act's Jurisdictional Limitations, and Motion to Strike Plaintiffs' Demand for a Jury Trial and for Punitive Damages ................. 12

     B.    The Facts Pled Demonstrate that The Embassy Was The Plaintiffs' Joint Employer ..................................................................................... 15

     C.    Sovereign Immunity Does Not Bar Plaintiffs' D.C. Human Rights Act Claims .. 17

     D.    Plaintiffs Sufficiently Allege Adverse Acts Occurring or Being Felt in the District of Columbia ........................................................................ 17

     E.    Plaintiffs' DCHRA Claims Are Not Time-Barred As They Did File Suit Within 1 Year of Discovery of the Alleged Unlawful Acts ................................ 18

     F.    The Title VII Claims of Plaintiffs Adetoro, Balduman, Gaujean-La Mar, Javaheri, and Wilkins (as well as Greer and Schramm) are Time-Barred Because they Did Not File Their EEOC Charges Within 300 Days of the Alleged Unlawful Acts .. 19

G.     Plaintiffs' Title VII Claims Are Not Time-Barred as Suit was Filed in a Timely Manner ............................................................................................................................ 22

H.     Plaintiffs' Balduman, Javaheri, and Schramm Failed to Exhaust Their Administrative Remedies as to Race ........................................................................ 23

I.     Section 1981 of the Civil Rights Act of 1866 Does Apply to the Embassy ............ 24

J.     Plaintiffs Sufficiently Allege that Race Discrimination Was the Cause of Their Terminations as Required to State a Section 1981 Claim ................................................. 24

V.   CONCLUSION ................................................................................................................... 25

**CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................13, 28

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).............................................12, 13, 28

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F. 3d 1175, (D.C. Cir. 2013).......14

*Conley v. Gibson*, 355 U.S. 41 (1957).......................................................................12

*District of Columbia Retirement Bd. v. United States*, 657 F. Supp. 428 (D.D.C. 1987) ............11

*El-Hadad v. United Arab Emirates*, 496 F. 3d 658 (D.C. Cir. 2007)...........................................16

*Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843 (2019)......................................................21

*Golden v. Management and Training Corp.*, 266 F. Supp. 3d 277 (D.D.C. 2017)......................17

*Grand Lodge of Frat. Order of Police v. Ashcroft*, 185 F. Supp. 2d 9 (D. D.C. 2001)...........11, 12

*Haase v. Sessions*, 835 F. 2d 902 (D.C.Cir.1987) .......................................................11

*Harmouche v. Consulate General of State of Qatar*, 313 F. Supp. 3d 815 (S.D. Tex. 2018).......16

*Herbert v. Nat'l Academy of Sciences*, 974 F. 2d 192 (D.C.Cir. 1992)........................................12

*Hohri v. United States*, 782 F. 2d 227 (D.C.Cir. 1986)................................................12

*Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12 (D.D.C. 1999) ........................................27

*Merlini v. Canada*, 926 F. 3d 21 (1st Cir. 2019) .......................................................16

*Osuoha v. District of Columbia Government*, 2003 WL 21466905 (2003) ..................................26

*Papasan v. Allain*, 478 U.S. 265 (1986)................................................................13

*Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F. 3d 247 (CA7 1994).............13

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) .........................................................14

*Schuler v. PricewaterhouseCoopers, LLP*, 514 F. 3d 1365 (2008).........................................22, 23

*Scolaro v. D.C. Board of Elections and Ethics*, 104 F. Supp. 2d 18 (D.D.C. 2000)....................12

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) .................................................14

*Walter Fuller Aircraft Sales v. Republic of Phil.*, 965 F. 2d 1375 (5th Cir. 1992) .......................15

## STATUTES

28 U.S.C. § 1391 ......................................................................................................................19

28 U.S.C.A § 1603(d) ...............................................................................................................15

28 U.S.C.A. § 1605 ...................................................................................................................15

29 C.F.R. § 1626.10(a) .........................................................................................................22, 23

29 C.F.R. § 1626.5.................................................................................................................22, 23

29 C.F.R. § 1626.7.....................................................................................................................23

29 C.F.R. § 1626.8.....................................................................................................................23

42 U.S.C. § 1981 ........................................................................................................1, 26, 27, 28

42 U.S.C. § 1988 .......................................................................................................................19

42 U.S.C. § 2000e et. seq. ...................................................................................................1, 19, 21

D.C. Code § 2-1401.01 et. seq...................................................................................................1

D.C. Code § 2-1402.01, et. seq..................................................................................................20

D.C. Code § 32-1001, et. seq.....................................................................................................20

D.C. Code 2-1403.16.................................................................................................................20

## OTHER AUTHORITIES

H.R. Rep. No. 94-1487...............................................................................................................13

## RULES

Fed. R. Civ. P. 12(b)(1) ..........................................................................................................4, 14

Fed. R. Civ. P. 12(b)(6) ..........................................................................................................4, 15

Fed. R. Civ. P. 8(a)(2) ...............................................................................................................15

**INTRODUCTION**

Plaintiffs' claims arise from KAA's and The Embassy of the Kingdom of Saudi Arabia's (the "Embassy") (collectively "Defendants") joint unlawful conduct as it pertains to the Plaintiffs' respective employment with Defendants. Specifically, Defendants violated the D.C. Human Rights Act, D.C. Code § 2-1401.01 et. seq. (the "DCHRA"); 42 U.S.C. § 1981 ("Section 1981); and Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e et. seq. ("Title VII"), as described in Plaintiffs' Second Amended Complaint ("SAC") and more thoroughly described herein. See SAC ¶ 4-6.

Following almost three (3) years of actions before the EEOC, the DCOHR and the Superior Court for the District of Columbia, KAA and the Embassy now seek to dismiss the Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). The Defendants argument in support of dismissal generally allege lack of subject matter jurisdiction, failure of the Plaintiffs to file claims in a timely manner, and failure to the Plaintiffs to adequately state claims under the DCHRA, Title VII, and Section 1981. Most of the Defendants' arguments are unvaried from the first motion to dismiss filed by KAA, which encompassed argument on behalf of the Embassy. See SAC ¶8-16.

As indicated, Plaintiffs' claims are based on Defendants' unlawful employment actions. More specifically, the SAC alleges that Plaintiffs were terminated because of their race, religion, and/or national origin. As Plaintiffs show herein, Defendant's Motion to Dismiss is unmeritorious, and should be denied.

# I. STATEMENT OF PERTINENT FACTS

## A. Parties

The Plaintiffs consist of a variety of races, religions, and national origins. As to religion, of the eight (8) Plaintiffs involved in this matter, two are Muslim: one Shia Muslim; and one non-traditional Muslim who does not identify with any specific denominational sect. In the SAC, the Plaintiffs accurately described the Plaintiffs as follows:

(1) Plaintiff Tosin Adetoro, is an African American, Muslim woman born in Nigeria and raised in the United States. On July 11, 2016, Ms. Adetoro began employment at KAA as the Science, Technology, Engineering, and Math ("STEM") Coordinator. Ms. Adetoro was in charge of the STEM and Science Department and the direct supervisor of eighteen (18) teachers. Ms. Adetoro's role included assisting with recruitment, coaching, and retention of Science and STEM teachers, and providing STEM training for all teachers in the school. Ms. Adetoro's direct supervisor was Dr. Shiree Slade, an African American woman, and the Director of Teaching and Learning. While Ms. Adetoro is a Muslim, she does not wear traditional religious garments, such as a hijab, and her failure to do so was heavily scrutinized by KAA. During a conversation with Dr. Ibrahim Sakaji, previously on the pastoral team at KAA, and was eventually promoted to Vice Principal at KAA, Ms. Adertoro asked about the possibility of Dr. Slade being promoted to principal. Dr. Sakaji stated that KAA representatives and the Embassy would not listen to a Black woman. On July 27, 2017, Ms. Adetoro was informed that she would not be offered a position at KAA for the 2017/2018 school year. Tosin Adetoro was terminated on July 27, 2017. See SAC ¶ 7a, 18.

(2) Plaintiff Barbara Balduman is a Caucasian, Catholic woman born and raised in the United States. On or about June 6, 2016, Ms. Balduman began employment at KAA as the Admissions Director. In her role as Admissions Director, she was

responsible for developing and implementing policies and procedures, hiring administrative staff, managing the registration process, and testing and enrolling students. Ms. Balduman oversaw the admissions process and the applications of over 1,200 applicants; she eventually enrolled over 800 students which involved overseeing the clinic staff, ensuring that county, state and federal regulations were complied with, and that student files were maintained privately and securely. Ms. Balduman reported directly to Chris Faisandier, the principal of KAA. On or about July 17, 2017, Ms. Balduman was notified that her last date of employment at KAA would be July 31, 2017. She was informed that the Admissions Office would be abolished and that both of her administrative assistants, Plaintiff Alexis Greer and Adeelah Aljuhani, would be terminated. However, although Plaintiff Alexis Greer and Ms. Balduman were terminated, Ms. Aljuhani maintained employment at KAA. Upon information and belief, Adeelah Aljuhani is a Saudi Arabian Muslim. Barbara Balduman was notified of her planned termination on July 17, 2017, and terminated on July 31, 2017. See SAC ¶ 7b, 19.

(3) Plaintiff Natasha Gaujean-La Mar is a Haitian/African-American, Catholic woman, who was born and raised in the United States. In July 2016, Ms. Gaujean-La Mar began employment at KAA as the Director of Learning Resources. Prior to beginning employment at KAA, Ms. Gaujean-La Mar worked as an Instructional Technology Coordinator with various schools, and as an Education Technology Specialist with the New Jersey Department of Education. She also had a supervisor certification which helped her in her role as the Director of Learning Resources. As the Director of Learning Resources, Ms. Gaujean-La Mar was tasked with allocating funds

and purchasing educational resources for staff and students while also managing the instructional technology team. On June 8, 2017, Ms. Gaujean-La Mar received an offer letter that included a contract for the 2017-2018 school year. The offer letter indicated that Ms. Gaujean-La Mar would be the Senior Coordinator of Instructional Technology, instead of the Director of Learning Resources. Ms. Gaujean-La Mar accepted the offer of employment, and signed and returned the contract on June 16, 2017. Less than one month later, on July 17, 2017 after Salwa Linjawi had been named the new principal of KAA, Ms. Gaujean-La Mar received a letter indicating that "Regrettably, it is not the intention of King Abdullah Academy to offer you a position for the 2017/2018 Academic school year." Another employee on the Instructional Technology team, who was an American white male and former ISA employee was not terminated. His title was Instructional Technology Coordinator. Natasha Gaujean-La Mar was terminated on July 17, 2017. See SAC ¶ 7c, 20.

(4) Plaintiff Alexis Greer is an African-American woman, born and raised in the United States. She does not identify with any specific religion. On June 6, 2016, Ms. Greer began employment at KAA in an administrative role in the Admissions Office. Ms. Greer helped create the records system for student's grades and successfully assisted with student enrollment. She also entered and managed students' schedules and grades. Additionally, Ms. Greer monitored the school's surveillance camera system. Ms. Greer reported directly to Plaintiff Barbara Balduman. In July 2017, Ms. Greer was told that the Admissions Office was being abolished; and on July 31, 2017, Ms. Greer was terminated, although, Adeelah Aljuhani, another administrative assistant in the Admissions Office

maintained employment with KAA.  Alexis Greer was terminated on July 31, 2017. See SAC ¶ 7d, 21.

(5)     Dr. Kethurah Williams Howell is an African-American, Christian woman who was born in the Bahamas and raised in Trinidad & Tobago.  On August 1, 2016, Dr. Howell began employment at KAA as the Professional Learning Community ("PLC") Director for 7th and 8th grade, and also as the Community Partnership Coordinator.   In December 2016, Dr. Howell became the Assistant Director of the Middle School (grades 5th-8th).  This role was similar to a Principal.   On May 25, 2017, Dr. Howell was offered a new contract for the 2017-2018 school year.  However, on July 27, 2017, Ms. Howell received a letter terminating her employment for the 2017-2018 school year.  Kethurah Howell was terminated on July 27, 2019.  See SAC ¶ 7e, 22.

(6)     Plaintiff Sepideh Javaheri is an Iranian, Shia Muslim woman, who was raised in Iran. In August 2016, Ms. Javaheri began employment at KAA as a medical technician.  However, her contract was not renewed for the 2017-2018 school year, and on July 31, 2017, Ms. Javaheri was terminated.  Sepidah Javaheri's last date of employment with KAA was July 31, 2017, as her contract was not renewed.  See SAC ¶ 7f, 23.

(7)     Plaintiff Michael Schramm is a Caucasian man who was born and raised in the United States.  Dr. Schramm is not Muslim.  On October 3, 2016, Dr. Schramm began employment at KAA as the Chief Academic Officer, but his title was eventually changed to Deputy Executive Principal.  His responsibilities included evaluating and advancing KAA's practices and systems of all aspects of teaching and learning, supervising and evaluating other KAA staff, and working in close partnership with the

Executive Principal, Chris Faisandier. During the third week of July 2017, Mr. Faisandier called Dr. Schramm by telephone to inform him that Dr. Schramm was being terminated. Michael Schramm was terminated in the third week of July 2017. See SAC ¶ 7g, 24.

(8)     Plaintiff Diane Wilkins is an African-American, Christian woman who was born and raised in the United States. On March 1, 2016, she began employment at KAA as the Human Resources Manager; however, because KAA was still under construction, she worked out of the Islamic Saudi Academy ("ISA") in Alexandria, Virginia. Ms. Wilkins reported directly to Chris Faisandier, the principal of KAA, until Salwa Linjawi was appointed as Acting Executive Principal on or about July 14, 2017. Ms. Wilkins' job responsibilities included providing strategic and operational day-to-day human resources leadership, ensuring compliance with federal and state laws and regulations relative to compensation, benefits, employment, payroll, and worker's compensation, and supervised staff in the HR department. On July 26, 2017, Ms. Linjawi met with Ms. Wilkins and informed Ms. Wilkins that her contract was not going to be renewed. Ms. Wilkins last date of employment was July 31, 2017. Prior to her last date of employment, Ms. Wilkins was informed that both the Admissions Office and the Human Resources Office would be abolished. However, on or about July 30, 2017, the position of HR Manager for KAA was posted. On or about August 3, 2017, Dr. Mohammed Bin Abdullah Al-Eissa, the Saudi Cultural Attache to KAA, along with the Ambassador to the Saudi Embassy approved the hiring of Nadia Yousef for the position. On information and belief Ms. Yousef is Saudi Arabian and Muslim. Diane Wilkins was

notified of her planned termination on July 26, 2017, and terminated on July 31, 2017. See SAC ¶ 7h, 25.

**B.    KAA/Embassy Joint Employer Relationship**

Plaintiffs were employed at KAA during the 2016-2017 Academic Year. Defendants terminated Plaintiffs' employment at the end of 2016-2017 Academic Year. Suleiman Almoziel, an employee of the Embassy, was in charge of overseeing the financial operations at KAA. All financial activities, including banking, contracts, accounts payable/accounts receivable, employment terms, insurance payments for the KAA physical facility, and employees were managed by Mr. Almoziel. KAA had to obtain the approval of the Embassy in order to disburse funds for payroll. Correspondence dated August 16, 2016, from Chris Faisandier, the Executive Principal of KAA, to a Saudi official at the Embassy requested a transfer of $1,000,000.00 to cover payroll. Correspondence dated March 15, 2017, from Zeyad Alazzaz, the Finance and Operations Manager for KAA, indicated that KAA was awaiting approvals on checks from certain Embassy officials. Certain departments, such as the Athletics Department, were promised computers and equipment. However, when this equipment was not provided, the staff in the Athletic Department was informed that the Embassy did not approve the funds needed to purchase same. Chris Faisandier was the Executive Principal at KAA during most of the 2016-2017 school year. As Executive Principal, Mr. Faisandier would reasonably be expected to have authority and control over personnel decisions and operational functions at KAA. On information and belief, the Embassy issued directives to Mr. Faisandier that he follow personnel decisions and operational functions at KAA. Mr. Faisandier attempted to terminate an administrative assistant, in the Admissions Department; but at the directive of the Embassy, Mr. Faisandier was prevented from terminating the employee. On information and belief, parents of students at KAA would make complaints to the Embassy, and the Embassy would direct KAA

personnel as to how to resolve the complaint. On information and belief, the Embassy directed KAA personnel to refrain from disciplining students who were Saudi Arabian and Muslim. Mr. Faisandier and Plaintiff Diane Wilkins developed a list of KAA employees recommended for termination because of low performance scores. See SAC ¶ 29-43. But Mr. Faisandier and Ms. Wilkins had no control over which employees would actually be terminated since many of the KAA employees marked for termination, and who were of Sunni Muslims and of Arabic Middle Easter descent, were ultimately retained.

C. **Defendants' Discriminatory Actions**

The opening of KAA coincided with the closure of a nearby institution, the Islamic Saudi Academy ("ISA"). Before the start of the 2016-2017 academic year, KAA began to give preference in hiring Saudi Arabian, Sunni Muslim candidates. A Saudi Arabian, Sunni Muslim employee, Adeelah Aljuhani, an administrative assistant in the Admissions Department, was frequently insubordinate to her superiors. On multiple occasions, Ms. Aljuhani advised the parents of KAA students to direct any complaints directly to the Embassy. Ms. Aljuhani also engaged in other inappropriate conduct, including attempting to remove files from the KAA clinic, registering students without proper immunization records and/or expired visas, and refusing to adhere to policies/procedures. Ms. Aljuhani was counseled about her inappropriate behavior, however, the Embassy prevented Mr. Faisandier from terminating her employment. At least three (3) students of Saudi Arabian descent used racial slurs against an African-American teacher, Shaylin Holley. Mr. Holley met with Plaintiff Dianne Wilkins and Mr. Faisandier on at least three (3) occasions to address the discriminatory treatment by students. Mr. Faisandier requested a meeting with the students that demonstrated discriminatory behavior; but despite multiple requests, the students did not show up for the meeting. Mr. Faisandier eventually

received a directive from the Embassy ordering him to stop contacting the students about the issues of racial discrimination. An HR assistant, Ahmed Fetah, was also subject to racial discrimination, including being called derogatory names, by students. Mr. Faisandier was not allowed to discipline the students directing racial slurs at Mr. Fetah. Martha Abouhamda, a KAA staff member, who was of Arabic, Sunni Muslim abandoned her job position for several months, without proper authorization, and without informing her supervisor Dr. Michael Schramm if she planned to return. Martha Abouhamda was granted a short bereavement following the death of her husband, but after two (2) weeks, several attempts were made by the HR Department to contact the employee to receive an update on her return to work date. The KAA HR Department did not receive a response from Ms. Abouhamda as to her return date. After two (2) months, Ms. Abouhamda finally contacted the HR Manager and was informed that she would be terminated. The KAA employee contacted the Embassy, and the Embassy required KAA representatives to allow Ms. Abouhamda to return to her employment position. Another KAA employee, Faith Jeffries, a Drama Teacher, and African-American woman, requested bereavement leave for the death of her husband; but Ms. Jeffries was only allowed three (3) days of leave. KAA teachers were counseled about the need to maintain strong relationships with Saudi Arabian Sunni Muslim students. KAA staff were instructed not to discipline students with connections to the Embassy, and were directed to give those students preferential grading. Saudi Arabian students were allowed to travel on extended vacations, additional holidays, and leave from school; Saudi Arabian students were also allowed to begin school after the official start date, and complete school before the official end date. The excessive absences from school meant that some Saudi Arabian students did not take final examinations or meet the Virginia "days in school" mandate of 180 days. In spite of the missing examinations, excessive absences

from school, and no meeting the "days in school" mandate of 180 days, the report cards of Saudi Arabian students were altered to allow students to advance to the next grade and/or graduate. Because of their race, ethnicity, and religion, Arabic Middle Eastern, Sunni Muslim candidates were hired instead of more qualified candidates who were not Arabic Middle Eastern, Sunni Muslims. Despite given preferential treatment to Arabic Middle Eastern, Sunni Muslim candidates, the KAA staff did, initially, include some employees who were not Sunni Muslims of Arabic Middle Eastern descent. KAA gave Arabic Middle Eastern, Sunni Muslim candidates more favorable treatment than those employees who were not Sunni Muslims of Arabic Middle Eastern descent. Saudi Arabian Muslims who were on the list recommended for termination were retained as employees at KAA. Employees who were not Saudi Arabian Muslims, including African-American employees, and non-Saudi Arabian, non-Muslim employees, that appeared on the list were eventually terminated. SAC 44-69

After the conclusion of the 2016-2017 academic year, its first year in existence, KAA, directed by the Embassy, terminated a number of non-Saudi Arabian, non-Sunni Muslim employees. The terminations were purportedly in response to financial issues which had arisen. In spite of purported financial issues, at KAA, employees who were Saudi Arabian and/or Sunni Muslim. The employees selected for termination were disproportionately non-Sunni Muslims who were not of Arabic Middle Eastern descent. Employees selected for termination also included Muslims who did not wear religious garments and who were non-Sunni Muslims. Non-Muslim employees, who were not of Arabic Middle Eastern descent, and who had been initially recommended for retention, were also terminated from KAA. Sunni Muslim employees, who were of Arabic Middle Eastern descent, and who had initially been recommended for

termination, were retained for employment at KAA. The termination decisions affected all KAA staff, including teaching and administrative staff. See SAC ¶ 70-77.

Plaintiffs' claims are not restricted solely to discriminatory conduct by Defendants on the basis of religion. The SAC also include allegations of discriminatory conduct by Defendants as to race and national origin. As such, the Defendants were not required to be certain, or have personal knowledge, of any of the Plaintiffs specific religious beliefs to unlawfully discriminate against them. The Plaintiffs have contended since the initiation of this matter that the Embassy and KAA, specifically the Board of Directors for KAA, were the [joint] decision makers.

## III.     STANDARD OF REVIEW

### A.     FED. R. CIV. P. 12(b)(1)

"Rule 12(b)(1) deals with the court's subject-matter jurisdiction..." *Grand Lodge of Frat. Order of Police v. Ashcroft*, 185 F. Supp. 2d 9 (D. D.C. 2001), quoting "*Haase v. Sessions*, 835 F. 2d 902, 906 (D.C.Cir.1987). Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction. See *District of Columbia Retirement Bd. v. United States*, 657 F. Supp. 428, 431 (D.D.C. 1987). Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority. *Ashcroft* at 14.

Furthermore, in deciding a 12(b)(1) motion, the court's consideration is not limited to the allegations of the complaint. See *Hohri v. United States*, 782 F. 2d 227, 241 (D.C.Cir. 1986), vacated on other grounds, 482 U.S. 64, (1987). Rather, "[t]he court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in

the case." *Scolaro v. D.C. Board of Elections and Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Academy of Sciences*, 974 F. 2d 192, 197 (D.C.Cir. 1992)).

**B.      FED. R. CIV. P. 12(b)(6)**

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The point of this requirement is to "give the defendant fair notice of what the…claims is and the grounds upon which it rests…" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ("Twombly"), quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Although a complaint confronted by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, see *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F. 3d 247, 251 (CA7 1994), see *Papasan v. Allain*, 478 U.S. 265, 286, (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). However, when a complaint pleads facts that make the claim plausible on its face, the court will not grant a dismissal. See *Twombly* at 557. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief..." Id. at 679.

**II.      ARGUMENT**

**A.      The Foreign Sovereign Immunities Act's Jurisdictional Limitations, and Motion to Strike Plaintiffs' Demand for a Jury Trial and for Punitive Damages**

Congress enacted the Foreign Sovereign Immunities Act (FSIA) to put an end to the case-by-case diplomatic pressures faced by the Executive Branch, to clarify governing standards, and to ensure that disputes with foreign nations are decided on purely legal grounds with the guarantee of due process. H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6606. See also *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983) (discussing legislative history of FSIA). Before Congress enacted the FSIA, courts granted immunity as an action of grace and comity. See *Verlinden*, 461 U.S. at 486-88. The FSIA set forth comprehensive legal standards governing civil actions where the defendant was a "foreign state or its political subdivisions, agencies, or instrumentalities." *Id*. at 488. Unless the matter falls within one of the exceptions, the courts of the United States do not have jurisdiction to hear the case. See *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

"The FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies," *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F. 3d 1175, 1183 (D.C. Cir. 2013). Once this burden of production is met, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Id*.

The Defendant Embassy asserts, incorrectly, that the Plaintiffs have not alleged, in the SAC or otherwise, that any of the needed FSIA exceptions apply in this matter. The Plaintiffs previously asserted, and continue to contend, that the commercial activity exception to sovereign immunity is applicable in this matter. See 28 U.S.C.A. § 1605. Subsection (a)(2) provides an exemption from foreign state immunity when an "action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside

the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." The FSIA defines "commercial" rather imprecisely, as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C.A § 1603(d).

To determine whether activity is commercial, the FSIA directs court to looks at the nature of the act, rather than the purpose of the foreign state's activities. 28 U.S.C.A. An action has a commercial nature if it is the type that an individual would engage in. *Walter Fuller Aircraft Sales v. Republic of Phil.*, 965 F.2d 1375, 1384 (5th Cir. 1992). 1603(d)(2002). The employment of diplomatic, civil service, or military personnel is "public or governmental not commercial in nature," while the "employment or engagement of laborers, clerical staff, or public relations or marketing agents" is "commercial and not public or governmental in nature" *El-Hadad v. United Arab Emirates*, 496 F. 3d 658 (D.C. Cir. 2007) (citing H.R. REP. NO. 94–1487, at 16 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6615. In *El-Hadad*, the Circuit Court affirmed the District Court's finding that plaintiff, an accountant, was not a civil servant and his work involved the exercise of "powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Id* at 667-68. Therefore, plaintiff's employment was commercial rather than governmental, and his suit was authorized under the Foreign Sovereign Immunity Act's commercial activity exception. *Id* at 668. See also *Merlini v. Canada*, 926 F. 3d 21 (1st Cir. 2019) (reversing district court's dismissal of employee's workers' compensation claim against the Consul General of Canada because her employment as an administrative assistant was purely clerical and her claim arose from "commercial activity" within the meaning of FSIA);

*Harmouche v. Consulate General of State of Qatar*, 313 F. Supp. 3d 815, 821-22 (S.D. Tex. 2018) (denying defendant's motion to dismiss employee's Title VII and ADEA claims because plaintiff, a public relations manager, was not a civil servant and none of his tasks involved sovereign law or policy but instead were consistent with a public relations manager's duties in the private commercial world).

Similarly, the Plaintiffs in the present case, school administrators, were not civil servants and their work as school administrators could have been exercised by private citizens. The Plaintiffs had no role in the creation of government policy, but were employed as a Science, Technology, Engineering, Math Director, Admissions Director, Director of Learning Resources, administrative assistant, Public Learning Center Director, medical technician, Deputy Principal, and Human Resources Manager. See SAC ¶18-28. Any private or public school in the country could have these same positions. Furthermore, KAA is a Saudi Arabian funded international school with the stated mission of enabling "student to excel academically while maintaining the values of Islam and proficiency with the Arabic language." SAC ¶ 26.

As the operation of KAA is a commercial activity, the Court must reject any contention that there is no basis to bring suit against the Embassy.

**B.     The Facts Pled Demonstrate that The Embassy Was The Plaintiffs' Joint Employer**

Despite the Defendants' claims to the contrary, the Plaintiffs SAC clearly demonstrates the level of joint-employer allegations needed to make such a claim. (See *Golden v. Management and Training Corp.*, 266 F. Supp. 3d 277 (D.D.C. 2017) pointing to lack of allegation that alleged joint employer could "control and direct" both the details and results of plaintiff's work or that it controlled the "terms and conditions" of his employment.")

The SAC establishes that Plaintiffs were employed at KAA during the 2016-2017 Academic Year, and defendants terminated Plaintiffs' employment at the end of 2016-2017 Academic Year. Suleiman Almoziel, an employee of the Embassy, was in charge of overseeing the financial operations at KAA. All financial activities, including banking, contracts, accounts payable/accounts receivable, employment terms, insurance payments for the KAA physical facility, and employees were managed by Mr. Almoziel. KAA had to obtain the approval of the Embassy in order to disburse funds for payroll. Correspondence dated August 16, 2016, from Chris Faisandier, the Executive Principal of KAA, to a Saudi official at the Embassy requested a transfer of $1,000,000.00 to cover payroll. Correspondence dated March 15, 2017, from Zeyad Alazzaz, the Finance and Operations Manager for KAA, indicated that KAA was awaiting for approvals on checks from certain Embassy officials. Some departments, like the Athletics Department, were promised computers and equipment. However, when said equipment was not provided, the Athletic Department staff were informed that the Embassy failed to approve the funds needed to purchase same. Chris Faisandier was the Executive Principal at KAA during most of the 2016-2017 school year. As Executive Principal, Mr. Faisandier would reasonably be expected to have authority and control over personnel decisions and operational functions at KAA. On information and belief, the Embassy issued directives to Mr. Faisandier that he adhere to certain personnel decisions and operational functions at KAA. Mr. Faisandier attempted to terminate an administrative assistant in the Admissions Department but at the command of the Embassy, Mr. Faisandier was prevented from terminating the employee. On information and belief, parents of students at KAA made complaints to the Embassy, and the Embassy directed KAA personnel as to how to resolve the complaint. On information and belief, the Embassy directed KAA personnel to abstain from disciplining students who were Saudi Arabian and

Muslim. Mr. Faisandier and Plaintiff Diane Wilkins developed a list of KAA employees recommended for termination because of low performance scores. In addition, the opening of KAA coincided with the closure of a nearby institution, the Islamic Saudi Academy ("ISA"). Before the start of the 2016-2017 academic year, KAA began to give preference in hiring Saudi Arabian, Sunni Muslim candidates. A Saudi Arabian, Sunni Muslim employee, Adeelah Aljuhani, an administrative assistant in the Admissions Department, was regularly disobedient to her superiors. On many occasions, Ms. Aljuhani advised the parents of KAA students to direct any complaints directly to the Embassy. Ms. Aljuhani also engaged in other inappropriate conduct, including attempting to remove files from the KAA clinic, registering students without proper immunization records and/or expired visas, and refusing to adhere to policies/procedures. Ms. Aljuhani was counseled about her inappropriate behavior; however, the Embassy prevented Mr. Faisandier from terminating her employment. See SAC 29-48.

As demonstrated by the extensive factual history summarized here and delineated in the SAC, the Embassy clearly "retained for itself sufficient control of the terms and conditions' of plaintiff's employment" as to qualify as a joint employer with KAA. As such, subject matter jurisdiction over both Defendants is proper.

### C.     Sovereign Immunity Does Not Bar Plaintiffs' D.C. Human Rights Act Claims

As demonstrated, the operation of KAA is a commercial activity, thus establishing an exception to the FSIA. Furthermore, the Embassy and KAA were joint employers over the Plaintiffs. As such, the Court must reject Defendants contention that sovereign immunity serves as a bar to the Plaintiffs' claims pursuant to the D.C. Human Rights Act.

### D.     Plaintiffs Sufficiently Allege Adverse Acts Occurring or Being Felt in the District of Columbia

The Defendants argue that the Plaintiffs failed to plead that Defendants' actions complained of within the SAC occurred within the jurisdiction limits of the District of Columbia. Again, the Defendants' argument is simply not true. The Plaintiffs properly pled that "[v]enue is proper in this Court pursuant to 42 U.S.C. § 1988, 42 U.S.C. Section 2000e-5, 28 U.S.C. § 1391, D.C. Code § 32-1001, et. seq., and D.C. Code § 2-1402.01, et. seq., because the acts and omissions complained of occurred within this judicial district, Defendant resides within this judicial district and the other Defendant is controlled by the residing Defendant. See SAC ¶ 6. As the factual contentions within the SAC demonstrate with certainty, that the acts and omissions complained of within Plaintiffs' SAC occurred with the District of Columbia.

**E.      Plaintiffs' DCHRA Claims Are Not Time-Barred As They Did File Suit Within 1 Year of Discovery of the Alleged Unlawful Acts**

The Embassy asserts that the Plaintiffs' DCHRA claims are untimely as they were not filed within the one-year period required under the DCHRA. The Defendants' claims are false. Because Plaintiffs' claims, when filed at the EEOC, were considered accepted at the D.C. Office of Human Rights ("DCOHR"), the claims were timely filed. Plaintiffs were terminated in July 20017, and filed claims at the EEOC in May 2018. This means that the claims, alleging discrimination based on race, national origin, and religion, were also to be considered accepted at DCOHR in May 2018.

The DCHRA states that a "private cause of action" is to be filed "within one year of the unlawful discriminatory act, or the discovery thereof." D.C. Code 2-1403.16(a). Furthermore, the "timely filing of a complaint with the Office [of Human Rights]… toll[s] the running of the statute of limitations while the complaint is pending". *Id.* The claims were timely filed with DC

OHR, and upon dismissal from DC OHR, the claims were immediately filed in a court of competent jurisdiction.

F.      **The Title VII Claims of Plaintiffs Adetoro, Balduman, Gaujean-La Mar, Javaheri, and Wilkins (as well as Greer and Schramm) are Time-Barred Because they Did Not File Their EEOC Charges Within 300 Days of the Alleged Unlawful Acts**

A review of the relevant legal authority shows that contentions alleging untimely Title VII claims are also without merit. In a situation such as this, when there exists a separate fair employment agency of the State or political subdivision, claimants are directed to first file their claims with the local agency. It is only thereafter that they are to file with the EEOC. "For complaints concerning a practice occurring in a State or political subdivision that has a fair employment agency of its own empowered "to grant or seek relief," Title VII instructs the complainant to file her charge first with the state or local agency. § 2000e–5(c). The complainant then has 300 days following the challenged practice, or 30 days after receiving notice that state or local proceedings have ended, "whichever is earlier," to file a charge with the EEOC. § 2000e–5(e)(1)." *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843 (2019). In addition, if the state or local agency has a "worksharing" agreement with the EEOC, as is the case between the DCHOR and the EEOC, "a complainant ordinarily need not file separately with federal and state agencies. She may file her charge with one agency, and that agency will then relay the charge to the other. See 29 CFR § 1601.13 (2018)." *Id*.

In this case Plaintiffs first filed their claims with the EEOC, and thereafter with DCOHR. However, it is clear that in situations such as this, when both the EEOC and a local counterpart

exists, that the law intends for said claims to first be filed with the local agency. As is discussed in further detail below, the Plaintiffs timely filed their complaints with the DCOHR, because the claims were filed at the EEOC within the required time. Furthermore, as has been previously established in this matter, a worksharing agreement exists between the EEOC and the DCOHR. As the Plaintiffs complaints were timely filed with the DCOHR, and as the law desires that said cases should have first been filed with the DCOHR to begin with.

As Plaintiffs previously pointed out, *Schuler v. PricewaterhouseCoopers, LLP*, 514 F. 3d 1365 (2008) ("Pricewaterhouse") provides guidance in precisely the issue of receipt of a complaint pursuant to a work sharing agreement. In determining which entity received Schuler's complaint, the EEOC's New York Field Office, the NYSDHR, the EEOC's District of Columbia Field Office, or the DCOHR, the Court weighed: "EEOC regulations, specifically 29 C.F.R. § 1626.10, allow the Commission to "enter into agreements with State or local fair employment practices agencies to cooperate in enforcement, technical assistance, research, or public informational activities, and [to] engage the services of such agencies in processing charges assuring the safeguard of the federal rights of aggrieved persons." *Id.* 29 C.F.R. § 1626.10(a). The regulations further provide that these agreements may "authorize such agencies to receive charges and complaints pursuant to 29 C.F.R. § 1626.5 and in accordance with the specifications contained in §§ 1626.7 and 1626.8." *Id.* § 1626.10(b). The first of these provisions allows aggrieved employees to submit EEOC charges "to any office of the Commission or to any designated representative of the Commission," *Id.* § 1626.5, the second establishes timeliness

requirements, Id. § 1626.7, and the third prescribes the necessary substantive contents of charges, Id. § 1626.8. Critically for this case, the regulation's final subsection provides:

> When a worksharing agreement with a State agency is in effect, the State agency will act on certain charges and the Commission will promptly process charges which the State agency does not pursue. Charges received by one agency under the agreement shall be deemed received by the other agency for purposes of § 1626.7.

*Id.* § 1626.10(c) (emphasis added). As had already been established in this case, the EEOC has entered into work-sharing agreements with the DCOHR. Thus, when the Plaintiffs filed their charges with the DCOHR, it was "deemed received" by the EEOC, thus ensuring the timeliness of them with the EEOC. See *Pricewaterhouse* at 1372.

As stated previously, the Plaintiffs timely filed their complaints with the DCOHR. Therefore, pursuant to the legal authority applicable to the work-sharing agreement between the DCOHR and the EEOC, the Plaintiffs' EEOC claims were timely.

After being terminated, Plaintiffs timely filed charges with the D.C. Office of Human Rights ("DCOHR") claiming discrimination on the basis of race, national origin, and religion against Defendants. Plaintiffs' charges were dismissed from DCOHR, for lack of jurisdiction, via letters dated between September 10, 2018 and September 12, 2018. In the letters dismissing the charges, DCOHR indicated that the Complainants could either file a request to reopen the charges at DCOHR or file a lawsuit on the merits of the case with D.C. Superior Court. On or about September 25, 2018, Complainants timely appealed the determination by DCOHR for lack of jurisdiction. On December 18, 2018, DCOHR denied Complainants request to reopen the

charges.  The DCOHR denial included notice that Plaintiffs could file a private action, on the merits, as DCOHR had administratively dismissed the matter.   Prior to initiating this Second Amended Complaint, Plaintiffs Tosin Adetoro, Barbara Balduman, Natasha Gaujean-La Mar, Kethurah Howell, Sepideh Javaheri and Diane Wilkins filed administrative claims with the Equal Employment Opportunity Commission ("EEOC") alleging violation of Title VII.   The administrative claims filed with the EEOC were timely. The administrative charges filed with the EEOC had been pending at the EEOC for more than 180 days.  A request for Right to Sue Letters was made on behalf of the Plaintiffs Tosin Adetoro, Barbara Balduman, Natasha Gaujean-La Mar, Kethurah Howell, Sepideh Javaheri and Diane Wilkins.  The EEOC issued the Right to Sue on July 3, 2019.  Applying the controlling legal authority to the facts of this case, it is clear that the Plaintiffs claims were submitted in a timely manner.

### G.    Plaintiffs' Title VII Claims Are Not Time-Barred as Suit was Filed in a Timely Manner

In raising the argument that the Plaintiffs failed to file suit within 90 days of receipt of the EEOC Right-to-Sue Notice, the Defendant Embassy omits crucial facts of the history of this case.  The Defendant Embassy avers that the EEOC issued Plaintiffs' right-to-sue notices on May 15, 2018 and June 6, 2018, but that the Plaintiffs did not file suit until December 18, 2018 – approximately 200 days later.  What the Plaintiffs failed to inform the Court is that the Plaintiffs sought reconsideration of the DCOHR's determination (a copy of same was previously submitted to the Court as "Exhibit E" to the Plaintiffs Opposition to Motion to Dismiss filed August 16, 2019).  The DCOHR thereafter provided a response to the Plaintiffs' requests for reconsideration on December 17, 2018.  (See Determination of Complainant's Request to Reopen previously

submitted to the Court as "Exhibit F" to the Plaintiffs' Opposition to Motion to Dismiss filed August 16, 2019.)

Therefore, given that the DCOHR issued said response on December 17, 2018, the Defendant Embassy's argument that the present suit is time-barred as the Plaintiffs did not file said suit within 90 days of the May 15, 2018, and June 6, 2018, dates is without merit.

### H. Plaintiffs' Balduman, Javaheri, and Schramm Failed to Exhaust Their Administrative Remedies as to Race

The Defendant requests the dismissal of Count III as to Plaintiffs Balduman, Javaheri, and Schramm's allegations of racial discrimination. The Defendant contends that as the EEOC charges of Plaintiffs Balduman, Javaheri, and Schramm do not include race as a basis for discrimination, the Plaintiffs did not exhaust the administrative remedies requirement and to race as the count should be dismissed.

In *Osuoha v. District of Columbia Government*, 2003 WL 21466905 (2003), the United States Court of Appeals for the District of Columbia opined "[i]n dismissing the complaint for failure to exhaust administrative remedies, the district court failed to consider the worksharing agreement between the D.C. Office of Human Rights (OHR) and the Equal Employment Opportunity Commission (EEOC), which was presented by the appellee on appeal." According to the agreement, the EEOC and OHR were to act as agents to accept complaints on behalf of the other:

> T]he EEOC and the [D.C. Office of Human Rights (OHR)] each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the Agency that initially receives the charge. EEOC's receipt of charges on the [OHR]'s behalf will automatically initiate the proceedings of both the EEOC and the [OHR] for the purposes of Section 706(c) and (e)(1) of Title VII.

As has been already established, there exists a worksharing agreement between the EEOC and the DCOHR. As the Plaintiffs filed with both agencies, their complaints in one office were effectively received in the other office as well. As such, their Plaintiffs' race claim was properly effected through all administrative channels.

I.     **Section 1981 of the Civil Rights Act of 1866 Does Apply to the Embassy**

As outlined above, the operation of KAA is a commercial activity, thus establishing an exception to the FSIA. Furthermore, the Embassy and the KAA were joint employers over the Plaintiffs. As such, the Court must reject Defendants contention that sovereign immunity serves as a bar to the Plaintiffs' Section 1981 Claims.

J.     **Plaintiffs Sufficiently Allege that Race Discrimination Was the Cause of Their Terminations as Required to State a Section 1981 Claim**

The purpose of Section 1981 claims is to provide a remedy or redress for instances of racially-motivated discrimination. Section 1981(a), which was originally enacted as the first section of the Civil Rights Act of 1866, 42 U.S.C. 1981, provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The law's intent is to put individuals on equal footing in the workplace, without regard to their race.

The Defendants assert that because the Plaintiffs claim discrimination based on national origin and other factors, they are essentially prohibited from raising a separate claim of racial discrimination. The Defendants reasoning is faulty.

The Plaintiffs readily admit that section 1981 claims can only be brought because of racial discrimination, not discrimination based on other factors. See *Kidane v. Northwest*

*Airlines, Inc.*, 41 F. Supp. 2d 12, 16-17 (D.D.C. 1999) (dismissing § 1981 claims alleging national origin discrimination). Race and national origin are "ideologically distinct" groupings. <u>Nyunt v. Tomlinson</u>, 543 F. Supp. 2d 25, 35 (D.D.C. 2008), aff'd sub nom. <u>Nyunt v. Chairman, Broad. Bd. of Governors</u>, 589 F.3d 445 (D.C. Cir. 2009) (internal citations omitted). Hence, the Plaintiffs assert discrimination claims based on national origin and religion under different counts of the SAC, but under §1981, Plaintiffs make a separate claim for racial discrimination.

The SAC states clearly that the sole basis for the Plaintiffs' 1981 claims is racial discrimination at the hands of the Defendants. Furthermore, at the time of the oral argument on October 16, 2019, Plaintiffs' Counsel clarified that the basis for the 1981 claim was solely race:

> THE COURT: Okay. So your Count II – you have Count I, race, religion, and national origin discrimination; that's the DCHRA. Count II, 1981 is just race discrimination.
>
> MR. MUNDCA: Yes, Your Honor.
>
> THE COURT: Are you saying you intended for that to be broader than race discrimination?
>
> MR. MUNDACA: The 1981 claim, no, Your Honor.
>
> THE COURT: No. Okay. So for 1981 you are just relying on race?
>
> MR. MUNDACA: That's correct.

N.T. pg. 35, 5-15. Plaintiffs' Counsel also clarified that the factual basis for the 1981 racial discrimination claim was in addition to, and separate and apart from, the Plaintiffs' national origin based claims, "….They were also discriminated against for national origin, but they have separate race claims…." See N.T. pg. 36, 9-25. The SAC includes additional factual details as to the 1981 claim. Accordingly, the Defendants' assertion that the 1981 claims fail and should be dismissed is without merit.

**V.     CONCLUSION**

The Plaintiffs' SAC properly asserts jurisdiction over both KAA and the Embassy, and Plaintiffs' SAC meets the standards and requirements set forth in *Twombly* and *Iqbal*. In addition, the Plaintiffs' claims are timely pursuant to DCHRA, Title VII and Section 1981. For the reasons set forth herein, the Plaintiffs request that the Defendants' Motion to Dismiss and Strike be denied in its entirety.

DATED: September 24, 2020

Respectfully submitted,

THE SPIGGLE LAW FIRM PC

   /s/Phillis h. Rambsy

Phillis h. Rambsy
Francisco Mundaca
4830 A. 31st Street, South
Arlington, Virginia 22206
202-499-8527 (telephone)
202-540-8018 (facsimile)
prambsy@spigglelaw.com
fmundaca@spigglelaw.com

*Counsel for Plaintiffs*

<u>**Certificate of Service**</u>

I hereby certify that on September 24, 2020, Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss was filed electronically with the CM/ECF system, which will send a notification of the filing to the following:

Haig V. Kalbian (hkalbian@kalbianhagerty.com)
Stephen Leckar (sleckar@kalbianhagerty.com)
888 17th Street, NW, Suite 1000
The Brawner Building
Washington, DC 20006
*Counsel for Defendant King Abdullah Academy*

Edward Lee Isler (eisler@islerdare.com)
Lori H. Turner (lturner@islerdare.com)
Isler Dare, PC
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
(703) 748-2690 (telephone)
*Counsel for Defendant*
*The Embassy of the Kingdom of Saudi Arabia*


_____ /s/ Phillis h. Rambsy _____
Phillis h. Rambsy